UMG RECORDINGS, INC., et al., Plaintiffs,

v.

MYSPACE, INC., et al., Defendants.

No. CV 06–7361 AHM (AJWx).

United States District Court, C.D. California.

Dec. 10, 2007.

---

Benjamin H. Glatstein, Brian D. Ledahl, Elliot N. Brown, Gregory Alan Fayer, Steven A. Marenberg, Irell & Manella, Los Angeles, CA, for Plaintiffs.

Dale M. Cendali, Johanna Schmitt, O'Melveny & Myers, New York City, David H. Orozco, Diana M. Torres, Stephen E. Morrissey, Susman Godfrey LLP, Jeremy Maltby, Robert M. Swerdlow, Shannon E. Keast, O'Melveny & Myers LLP, Los Angeles, CA, H. Lee Godfrey, Susman Godfrey LLP, Houston, TX, Marcus S. Quintanilla, O'Melveny & Myers, Newport Beach, CA, Martin S. Checov, O'Melveny & Myers LLP, San Francisco, CA, for Defendants.

## ORDER DENYING MOTION TO DISQUALIFY O'MELVENY & MYERS, LLP

A. HOWARD MATZ, District Judge.

### I. INTRODUCTION

The tale that follows reveals quite a lot about how law is practiced at certain levels of the legal profession. It reflects the pitfalls that large firms representing pow-

erful clients in high stakes disputes often encounter in complying with ethical and professional requirements that were promulgated in a different era.

Several years ago, what has been described as the largest music recording and distribution company in the United States became embroiled in highly publicized copyright litigation involving Napster. A federal judge ordered the company to produce documents it had withheld under the attorney-client privilege, finding that the company had used the documents to perpetrate a fraud. At stake was whether the recording company colluded with competitors to misuse copyrights and thereafter deceived the United States Department of Justice and others. The company, already represented by a prominent law firm, retained a giant multinational law firm to overturn that ruling on appeal and to deal with the Department of Justice. The law firm already represented other clients that were likely to have legal disputes with the recording company, and so it obtained a waiver of potential conflicts of interest. Although the waiver was negotiated over a lengthy period, it was never reduced to a single document. Meanwhile, the firm enlisted nineteen of its lawyers, from different offices, to work on the engagement. Ultimately, by virtue of a settlement, the client-record company was not required to produce the documents and the Department of Justice inquiry was terminated.

Shortly afterward, the recording company filed an unrelated action against the world's largest social networking internet website. Sure enough, the website defendant retained the huge law firm to defend it. The law firm created an ethical wall and filed an answer containing eighteen affirmative defenses. One such defense, the third, alleged in its entirety: "Each and every cause of action in the [First Amended Complaint] is barred by the mis-use of copyright doctrine." A few months later, the law firm served discovery responses and requests relating to that affirmative defense. Those documents caused the recording company to charge that the law firm had thereby breached its duty to preserve its confidential information, and it moved to disqualify the law firm. That motion is now before the Court.

Plaintiff UMG Recordings, Inc. ("UMG") filed this lawsuit on November 17, 2006, claiming that Defendants MySpace, Inc. and News Corporation (collectively, "MySpace") have enabled or induced others to infringe, their copyrights. On August 20, 2007 UMG moved to disqualify the law firm for Defendants, O'Melveny & Myers ("OMM"). OMM previously represented UMG in an action entitled *In re Napster Copyright Litigation* and a related Department of Justice ("DOJ") inquiry. UMG alleges that OMM's prior representation of UMG in those matters is substantially related to issues in this litigation, thereby mandating OMM's disqualification. OMM responds that the two matters are not substantially related but that even if they are, UMG waived any right to object and to have OMM disqualified.

The Court finds that OMM did transgress its duties to UMG, but DENIES Plaintiff's motion because a number of factors, in the aggregate, enable the Court to fashion a remedy that achieves the purposes of the applicable ethical rules without depriving Defendants of their right to select their own counsel. Those factors include MySpace's abandonment of the contentions and efforts that created the conflict; the absence of any actual disclosure of confidential information; and the Court's exercise of its inherent authority to preclude MySpace from pursuing such conflict-triggering matters. In addition the Court will require MySpace to reim-

burse UMG for its substantial attorneys fees.

## II. FACTS[1]

### A. *Prior Hummer Winblad Litigation.*

In 1999, various record companies (including UMG, f/k/a Polygram Records, Inc.) filed suit against Napster, Inc. ("Napster") for copyright infringement. Napster unsuccessfully asserted copyright misuse as an affirmative defense, and the district court enjoined it from operating its peer-to-peer music file sharing service. *See A & M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896, 923 (N.D.Cal.2000). At some unspecified point during the pendency of that case, UMG entered into a joint venture with Sony Music Entertainment ("Sony") for the digital distribution of online music. The venture was called "pressplay."

In July 2001, the Antitrust Division of the United States Department of Justice ("DOJ") launched an investigation into whether pressplay was a smokescreen designed to enable UMG and Sony to collaborate to block meaningful distribution of digital music on the Internet. In December 2002, UMG and Sony submitted a "White Paper" to the DOJ, setting forth their position regarding the pressplay joint venture. Sometime thereafter, UMG and Sony sold their controlling interests in pressplay, and on December 23, 2003, the DOJ closed its inquiry into pressplay, stating that it "uncovered no evidence that the major record labels' joint ventures have harmed competition or consumers of digital music" and "found no impermissible coordination among the record labels as to the terms on which they would individually license their music to third-party services." *See* DOJ Press Release at http://www.usdoj.gov/atr/public/press—releases/2003/201946.htm.

On April 21, 2003, after Napster had filed bankruptcy, UMG filed separate suits against Napster's major investors, Hummer Winblad Venture Partners ("Hummer Winblad") and Bertelsmann AG. The cases were consolidated before the Honorable Marilyn Patel in the Northern District of California. UMG and the other plaintiffs claimed that by investing in Napster and assuming control of the Napster file-sharing network, defendants contributorily and vicariously infringed plaintiffs' exclusive rights under the Copyright Act. On August 31, 2004, Hummer Winblad filed an Answer, setting forth the affirmative defense that UMG had engaged in "copyright misuse" and counterclaiming against UMG for alleged antitrust violations, including collusion with other record companies, Sony and BMG among them, to eliminate competition in the market for the online distribution of recorded music.

On December 12, 2005, Hummer Winblad moved to compel the production of documents that UMG had provided to the DOJ in connection with the 2002 "White Paper." UMG had refused to provide the documents on the basis that they were privileged under the attorney-client privilege. Hummer Winblad contended that UMG knew that those arguments were false or misleading and that the "crime-fraud" exception to the attorney-client privilege precluded UMG from withholding them.

There were three categories of alleged misrepresentations that Hummer Winblad pointed to. One involved whether UMG had incorrectly asserted to the DOJ that it had licensed its copyrighted recordings on terms that were widely disparate from

---

1. The record citations for these facts were set forth in a chronology that the Court provided to counsel at the hearing.

those offered by its competitors. The second was whether UMG had falsely represented that it had not exchanged competitively sensitive information with competitors through the guise of the pressplay joint venture. The third was whether UMG had redacted non-privileged documents in an attempt to hide the first two alleged misrepresentations.

On April 21, 2006, Judge Patel ruled that the crime-fraud exception applied and that UMG could not withhold the documents. She noted that the findings of the DOJ that UMG had violated no law "are a near-verbatim recitation of the arguments advanced in the ... White Paper[ ]." At some unspecified time shortly after this ruling, the DOJ advised UMG that it was initiating a new inquiry into the issues raised by Judge Patel's finding.

Some ten days later, on or about May 1, 2006, Ronald Olson, a partner in the Munger Tolles & Olson firm which had been representing UMG in the matter before Judge Patel, asked OMM's Walter Dellinger to represent UMG in appealing Judge Patel's order. Dellinger, a partner in OMM's Washington, D.C. office, agreed to represent UMG. On or about May 5, 2006, a lawyer from yet another firm representing UMG asked Richard Parker, also a partner in the Washington, D.C. office of OMM, to represent UMG in the DOJ inquiry. He agreed to do so.

On May 10, 2006, on behalf of UMG, OMM filed with the Ninth Circuit (1) an emergency motion for stay pending appeal of Judge Patel's order; (2) an emergency motion to expedite an interlocutory appeal; and (3) an emergency motion shortening Hummer Winblad's time to respond to UMG's emergency stay motion. On May 19, 2006, the Ninth Circuit granted UMG's emergency stay motion. On May 26, 2006, OMM filed an opening brief on behalf of UMG asking the Ninth Circuit to reverse Judge Patel's order. Meanwhile, on the DOJ front, OMM's Parker and other UMG counsel were preparing to make a presentation to the DOJ explaining why it should shut down its recently-reopened inquiry. The presentation was made sometime in June 2006.

**B.** *Engagement Letter and Conflict Waiver.*

On June 5, 2006, OMM's Dellinger sent an engagement letter to UMG's Senior Vice President for Business and Legal Affairs, Harvey Geller. In relevant part, the letter described OMM's representation as relating only to (1) UMG's appeal of the district court's crime-fraud ruling and (2) UMG's discussions with the DOJ regarding the White Paper submissions at issue in the Ninth Circuit appeal. Dellinger referred to these undertakings collectively as the "Subject Matter." His letter went on to state that as a condition of OMM undertaking this representation UMG would have to agree that:

- [OMM] can continue to represent, or can in the future represent, existing or new clients in any matter, including litigation or other adversarial proceedings, so long as the matter is not substantially related to [OMM's work for UMG] on the Subject Matter, even if those other clients' interests are adverse to [UMG] in the other matter.

- [UMG] waives any conflict of interest that might arise from any of such engagements, and will not seek to disqualify [OMM] in or assert a conflict with respect to any of these engagements.

Dellinger also stated that:

[W]ithout [UMG's] further prior written consent, [OMM] cannot and will not represent another client in a matter adverse to [UMG] if [OMM has] obtained confidential information of a nonpublic nature

from [UMG], as a result of [OMM's] representation of [UMG], that, if known to the other client, could be used in the other matter by the other client to [UMG's] material disadvantage unless [OMM] establishe[s] a "screen" consistent with [OMM's] customary practices to separate staffing and to preserve [UMG's] confidences; [UMG] consents to this arrangement.

Several weeks elapsed and then on July 18, 2006, Dellinger sent Geller another copy of the same engagement letter, which he requested Geller sign and return. On August 31, 2006, Geller sent Dellinger an email response. Geller stated:

[I]t would seem that [OMM] is asking for a much broader waiver than we typically give. While we have no problem giving a waiver for transactional work, we do not normally give waivers that allow our firms to sue us while they are at the same time representing us. If this is not what [OMM] intended, please let me know. We of course recognize and agree that once the engagement ends, then the only limitation on [OMM] is that it cannot be adverse to us on a matter substantially related to the current engagement.

Later that day, Dellinger responded to Geller, via email. Dellinger told Geller that he understood UMG's concerns and that he would clarify or fix the language and get back to him. Before Dellinger did so, however, he argued the appeal of the crime-fraud ruling before the Ninth Circuit. That was on September 13, 2006. Dellinger did not bill any additional time on the matter thereafter.

Sometime in October 2006, UMG's chairman issued a public statement that raised the possibility that UMG would pursue litigation against various so-called "user-generated content" and "social networking" websites to obtain redress for alleged copyright infringement.

On October 26, 2006, the OMM–UMG exchanges concerning the conflict waiver resumed. This time, a different OMM partner, Robert Schwartz, sent an email to a different UMG representative Michael Ostroff, its General Counsel. Schwartz requested UMG's approval of a waiver stating:

[N]otwithstanding [OMM's] work ... [on the Hummer Winblad matter], UMG waives any conflict or rule that would prevent [OMM] from representing a party whose interests are adverse to UMG in pending or future cases that concern infringement of intellectual property rights on the Internet, such as the defendant in the *UMG v. Grouper Networks, Inc.*, matter. With respect to any such representation, [OMM] will place those attorneys involved in the UMG matter behind an ethical wall.

Ostroff responded the next day. His email to Schwartz said:

The proposed [waiver] is OK, provided we are clear that UMG is not waiving any conflicts related to the specific issues and parties involved in [OMM's] representation of UMG in the Hummer Winblad matter.

Ostroff also requested that OMM implement specific safeguards in connection with its "ethical wall."

On the same day, October 27, 2006, Dellinger responded to Ostroff, seeking clarification of Ostroff's email. Dellinger stated:

[W]e need clarification that you mean by the phrase "we are clear that UMG is not waiving any conflicts related to the specific issues and parties involved in [OMM's] representation of UMG in the Hummer Winblad matter" (which as I understand it, involves Napster and its investors) not merely "related" in a loose sense, but rather "substantially related" in the sense employed by the ethical rules and authorities, and that

you did not intend by this phrase to defeat the original waiver of "any conflict or rule that would prevent [OMM] from representing a party whose interests are adverse to UMG in pending or future cases that concern infringement of intellectual property rights on the Internet."

Dellinger's email also accepted UMG's requested ethical wall safeguards, subject to certain clarifications.

On November 1, 2006, Ostroff sent Dellinger a pithy email: "Your clarification is fine." The parties did not exchange any further correspondence concerning the waiver.

Although there is no single document containing the terms of the waiver at issue here, the foregoing written exchanges between UMG and OMM constitute the parties' contract. What they agreed, in essence, is that:

(a) regardless of when OMM's representation of UMG ended, OMM could undertake any representation, even one adverse to UMG, unless the new matter was substantially related to the specific issues and parties involved in OMM's representation of UMG in the Hummer Winblad matter;[2] (b) in particular OMM could represent an adverse party in litigation involving infringement of intellectual property rights; and (c) as to the "ethical wall,"

(i) All the people who worked on the Hummer Winblad matter and the paper and electronic files maintained in that matter would be labeled and segregated so that OMM personnel working on other matters adverse to UMG, if any, would not access them.

(ii) OMM would send a memo to all personnel in the firm (not just personnel currently working on the pending UMG matters) and would implement a documented procedure that ensures that a copy of the memo would be read and understood by all legal and non-legal personnel who were subsequently asked to perform any work on any aspect of the Hummer Winblad case and any case or matter where OMM was adverse to UMG.

(iii) A copy of the memo would be posted visibly on file-room doors and file cabinets containing any such files, but such postings of the memo would not remain after such documents were shipped to storage following the conclusion of OMM's involvement in the Hummer Winblad matter.

(iv) OMM would implement all technologically feasible measures to restrict access to electronic documents so that personnel (legal and non-legal) working on one matter could not access the electronic documents of the other, and vice-versa. For example, documents accessible through a central document management system (e.g., "DocsOpen") would be coded with restrictions on document access that preclude members of the other team from obtaining access to electronic documents in breach of the ethical wall.

What is not necessarily or facially clear about the conflict waiver is (1) what was the "Hummer Winblad matter" and (2) what would be "substantially related" to the Hummer Winblad matter? As the dispute has escalated in the papers the parties have filed on this motion, it also appears that another issue is whether the ethical wall entitles OMM to continue to represent MySpace, even if this action is a

---

**2.** UMG does not contend that *both* the issues and the parties have to be related in order for this "carve-out" to be applicable.

substantially related matter. The Court will address these questions in section III.

### C. *Extent of OMM's Representation in the Hummer Winblad Matter.*

For work performed between May 2, 2006 and September 15, 2006, OMM billed UMG for over $630,000 in legal fees and costs. During that period, nineteen OMM attorneys and four paralegals billed UMG for 1031 and 29 hours of work, respectively.

The parties dispute just when OMM ceased to represent UMG. OMM contends that it ceased representing UMG even before the waiver was negotiated and executed. UMG contends that the representation did not "officially" end until May 21, 2007, when the DOJ closed its formal inquiry without taking official action. It is unnecessary for the Court to specify the precise date, because under both parties' views, the representation ended well before June 28, 2007, the date when MySpace served its "Second Set of Requests for Production of Documents" that prompted UMG to conclude that OMM had a conflict of interest. (See below.) Thus, this is a case involving a law firm's *successive* (not *concurrent*) representation of adverse clients.

The Court has reviewed OMM's bills and timesheets, which were filed *in camera* on October 10, 2007. The vast majority of the hours OMM billed to UMG were for the Ninth Circuit appeal. Sixteen OMM attorneys worked principally on that appeal; three worked principally on the DOJ investigation. Dellinger and two other attorneys in OMM's Appellate Practice Group, Nicole Saharsky and Daniel Bookin, accounted for approximately 60% of the total hours billed to UMG. Dellinger billed approximately 260 hours, Saharsky approximately 240 hours, and Bookin approximately 120 hours. Meanwhile, Richard Parker and Darren Tucker, an attorney in OMM's Antitrust/Competition Practice Group, billed approximately 50 and 105 hours, respectively, for approximately 15% of the hours billed to UMG. Only two other OMM attorneys billed more than 30 hours. Dellinger, Parker, Bookin, and Tucker are the only OMM attorneys who billed hours to UMG in each of the four and one-half months during which OMM represented UMG.

OMM's bills and timesheets show that attorneys in the firm's appellate and antitrust departments did interact with each other on the UMG representation extensively. For instance, Dellinger and Parker "conferred" for at least six hours and Dellinger, Saharsky, and Bookin attended meetings with Parker for another 12 hours. Bookin, who worked primarily on the appeal, reviewed and analyzed the White Paper and contributed to developing OMM's strategy for the DOJ inquiry. Antitrust attorney Darren Tucker billed 20 hours for conducting research for and drafting a section of UMG's appellate brief. Moreover, during the oral argument before the Ninth Circuit, Dellinger told the Court that he had reviewed the White Paper and thought "everything submitted in the White Paper was true."

That OMM considered the Ninth Circuit appeal and the DOJ inquiry as an interrelated matter is conclusively reflected in the fact that it prepared only a single monthly bill, with a single matter number, for the engagement.

### D. *Developments in this Lawsuit.*

On November 17, 2006, UMG, a major producer and distributor of records, filed this action against MySpace, a well-known social networking website, and its parent company, News Corporation, alleging direct, contributory, and vicarious copyright infringement, inducement of copyright infringement and violations of California

Business and Professions Code section 17200. On December 1, 2006, the OMM "Legal Ethics and Conflict Resolution Committee" circulated a Confidential Memorandum to "All Attorneys and Employees" in that firm's many offices.[3] The subject was "Screening of Certain Attorneys Working on Behalf of . . . Fox Group, Inc. from Attorneys Working in Representation of Universal Music Group (the 'Subject Matter')." The Court has reviewed the full, unredacted text of this memorandum, which was filed under seal. OMM served UMG with a redacted copy which deleted references relating to another OMM client. The Court also reviewed the redacted copy and is satisfied that UMG received the entire contents of the portions of this screening memorandum that relate to this case.

The memorandum identified by name the attorneys working for Fox and the attorney who had been assigned to the representation of UMG. It provided that both sets of attorneys "are screened" from working on the other client's matters. It then proceeded to define "screened" to mean "disqualified from *any participation or involvement*" in the other matter. [Emphasis in original.] Elsewhere the memorandum extended the "screen" to staff members. The memorandum explicitly prohibited discussions, requests for assistance, assistance, hypothetical questions based upon facts involving the representation of the other client and access to any files or information related thereto. It contained provisions requiring the specified attorneys to call the notice to the attention "of any new attorneys, law clerks, summer associates, legal assistants, secretaries, and other staff members."

OMM appeared on December 11, 2006, when it filed a motion to dismiss on behalf of MySpace. On February 12, 2007, the Court granted MySpace's motion to dismiss the section 17200 claim, with leave to amend.

On February 20, 2007, UMG filed its First Amended Complaint ("FAC"), which did not allege violations of California Business and Professions Code section 17200. On March 6, 2007, MySpace filed its Answer to the FAC. The Answer asserted, *inter alia*, the following affirmative defense of copyright misuse:

Each and every cause of action in the FAC is barred by the misuse of copyright doctrine.

On April 30, 2007, MySpace responded to UMG interrogatory number 12 that required MySpace to disclose the basis of its copyright misuse affirmative defense. MySpace responded, in relevant part:

UMG refuses to comply with the DMCA and has not provided MySpace with notifications that substantially comply with the DMCA's requirements of works it alleges were on MySpace.com without authorization. Additionally, UMG has both (1) failed to register all of its works with Audible Magic, the filtering vendor preferred by UMG and employed by MySpace and other websites, thereby knowingly allowing those works to bypass the Audible Magic filter; and (2) registered with Audible Magic works whose content it does not own, thereby knowingly blocking works that UMG does not have the right to block. UMG and/or its agents also have knowingly posted content to which UMG owns copyrights to both the MySpace Video section of MySpace.com and on band pages that UMG has not included on its white list. UMG knows that its refusal to give proper DMCA notice, refusal to include all of its works in the Audible Magic database, inclusion of works in the Audible Magic database for which it

---

**3.** Defendant News Corporation is the parent company of Fox Group Inc.

does not own rights, and its (or its agents') posting of content to the MySpace Videos section and/or on band profiles not included on UMG's white list, individually and collectively, make it impossible to distinguish authorized from unauthorized content, if any.

Moreover, until late 2006, UMG also treated its video content as a marketing tool for its audio content and thus did not object to, and indeed encouraged, the copying and distribution of its video content by users. At all times leading up to this lawsuit, UMG was aware of MySpace's actions and the very same facts upon which UMG bases its complaint, yet it conveyed by words and actions, including through numerous public statements by representatives of UMG and during a meeting and various interactions between UMG and MySpace in and around Summer and Fall 2006, that it believed MySpace was a beneficial promotional tool and was taking all appropriate actions to hinder the uploading of unauthorized content to MySpace.com. Even since filing suit in November 2006, UMG has failed to avail itself, or delayed in availing itself, of many of the tools MySpace offers to prevent or minimize the presence of unauthorized content on the MySpace.com website. Additionally, on information and belief, UMG is selectively enforcing its copyrights on terms that are unfavorable to MySpace in an effort to undermine MySpace's ability to compete against UMG. In light of these facts, UMG's decision to file suit against MySpace in November 2006, and to maintain that suit now, reflects an attempt by UMG to enforce its copyrights beyond what Title 17 allows.[4]

At the hearing on this motion, counsel for UMG confirmed that nothing in this response led, or now would lead, UMG to conclude that OMM had a conflict, because it raises issues unrelated to the *Hummer Winblad* matter.

Until May 17, 2007, OMM was the only law firm that had filed an appearance representing MySpace. On that day, the law firm of Susman Godfrey LLP ("Susman") filed a notice of appearance on behalf of MySpace.

On June 28, 2007, MySpace served UMG with its Second Set of Requests for Production of Documents. MySpace's Request No. 153 seeks "All documents … produced pursuant to discovery requests pertaining to the action *In re Napster Copyright Litigation*" (with citations to Judge Patel's cases). It is not disputed that many such documents are already in OMM's files, and therefore a key element of UMG's motion is that OMM sought confidential UMG information it knew it already had. MySpace's Request Nos. 154 through 162 seek documents relating to UMG's licensing of content to peer-to-peer systems and communications between UMG and its competitors.

On July 9, 2007, MySpace provided to UMG its portion of a Joint Stipulation that MySpace intended to include in a motion it was planning to file to compel production on its first set of document requests. One of the categories of documents that MySpace was seeking to have UMG compelled to disclose was set forth in its Request No. 97, which stated: "All Documents and Communications concerning any transaction Plaintiffs have contemplated, pursued, or completed to acquire any Entities with substantial copyright portfolios, including, but not limited to, Vivendi SA's acquisition of Sony BMG Music Publishing." MySpace stated in the proposed stipulation that such documents were discoverable because, "Documents demonstrating

---

**4.** This is now the only basis that MySpace proffers for its affirmative defense. See *infra*.

[UMG's] attempts to collude with other copyright holders to control or otherwise monopolize portfolios of copyrighted materials are directly relevant to this [copyright misuse affirmative] defense...."

On July 12, 2007, Steven Marenberg, UMG's lead counsel, sent a letter to Dale Cendali and Diana Torres, partners in OMM's Los Angeles office and lead counsel for MySpace. Marenberg conveyed UMG's demand that OMM "immediately withdraw as counsel for MySpace and News Corp. [because] O'M & M is now seeking to litigate against UMG regarding issues that are substantially related to issues as to which O'M & M previously represented UMG."

A few days later, on July 16, 2007, MySpace sent UMG a "reformatted" copy of its portion of the Joint Stipulation, which no longer contained MySpace's argument that it required and deemed "directly relevant" evidence of UMG's alleged collusion with other copyright holders to prove copyright misuse.

On July 23, 2007, Dale Cendali, the OMM partner who had been in charge of OMM's defense of MySpace in this case, responded to Marenberg's July 12, 2007 letter. In substance, she stated that the OMM attorneys on this case had been screened from any confidential information and "have only limited information as to what [the prior representation] involved." She went on to state that the discovery requests to which Marenberg had referred were prepared by the Susman firm; that the interrogatory responses OMM previously served (before Susman had filed its notice of appearance) related to a copyright-based misuse defense that "does not relate to antitrust issues;" and that "the only aspect of MySpace's copyright misuse defense with which [OMM] will be involved is that relating to UMG's assertion of copyright infringement as to works it does not own ... an aspect of the present case

that does not ... relate to the *Napster Litigation.*"

On July 31, 2007, MySpace withdrew Request No. 97 from MySpace's First Set of Requests for Production and Request Nos. 153 through 163 from MySpace's Second Set of Requests for Production. At the hearing on this motion, counsel for UMG pointed out that OMM had informed him that "MySpace will re-propound the relevant discovery requests in separate documents to reflect the fact that Susman Godfrey is responsible for the representation of MySpace on antitrust issues...."

At the hearing on October 15, 2007, the Court encouraged the parties to pursue a consensual resolution of this dispute. On October 23, 2007, MySpace filed a document ("Notice of Service of Supplemental Response to Interrogatory No. 12") notifying the Court that the parties had reached no agreement and asking the Court to consider the Supplemental Response as a further specification of the "limits of its misuse defense...." The Supplemental Response explicitly states that so long as OMM remains counsel of record, MySpace will not base any claim or defense on eleven different allegations, including allegations relating to the White Paper; to the DOJ investigation; to collusion between UMG and Sony or any other record label to restrain competition; to anti-competitive conduct engaged in by UMG before December 23, 2003; to "any of the allegations or issues alleged by Hummer Winblad" in the litigation identified above in Section II(A) of this Order; and, in an explicit effort to avoid anything substantially related to its prior representation of UMG, to "any allegation that UMG collusively or otherwise improperly licensed or failed to license intellectual property rights ... or used its copyrights to unlawfully restrain competition before July 1, 2005...." MySpace's counsel, Robert

Swerdlow, filed an accompanying declaration representing that the "supplemental response was meant to verify that MySpace was not pursuing and will not pursue any claim or defense in this action that is substantially related to [OMM's] prior representation of UMG, including before the Department of Justice, so long as [OMM] remains MySpace's counsel in this case." Thus, without MySpace saying so explicitly, it is apparent that MySpace now argues implicitly that since there can be and is no pending conflict, there is no basis to disqualify OMM.

## III. ANALYSIS

### A. *Summary of Parties' Contentions.*

UMG initially argued that OMM's representation of UMG in the Hummer Winblad and *In re Napster* matters involved significant issues substantially related to the copyright misuse affirmative defense that MySpace had asserted in this case. Such substantially related representation mandates disqualification under California law, argued UMG, notwithstanding the waiver it granted to OMM, because that waiver does not encompass such representation. Moreover, even if the waiver could be construed to allow OMM to represent MySpace, the waiver was procured improperly and is not enforceable. Finally, UMG contended, the ethical wall that OMM established does not permit OMM to represent MySpace, even if that wall were scrupulously administered, for two reasons: (a) OMM agreed to erect that wall in addition to, and not in lieu of, avoiding substantially related representation and (b) California courts do not approve of such walls as a means of avoiding "full firm disqualification."

MySpace and OMM initially contended (1) that the affirmative defense of copyright misuse was not substantially related to OMM's prior representation; (2) that the "Hummer Winblad matter" referred to in the exchanges relating to the waiver did not include OMM's representation of UMG before the Department of Justice; (3) that UMG agreed to allow OMM to represent MySpace even if OMM had obtained confidential information relevant to the affirmative defense; (4) that the ethical wall protects UMG's confidentiality interests and rights; and (5) that it was the Susman firm that was responsible for initially preparing the discovery papers that triggered this motion, so disqualification of OMM would be unwarranted because it merely signed and served those materials.

As noted above, after the October 15, 2007 hearing MySpace and OMM changed their positions. And for good reason: some of their core contentions were unfounded, as the next sections of this Order demonstrate. Their concession in their October 23, 2007 Supplemental Response to Interrogatory 12 suffices to permit the Court to deny the disqualification motion. But there are conditions to this conclusion, which are set forth in sections E and F, *infra.* One condition is that MySpace must reimburse UMG for the reasonable attorneys fees it incurred on pursuing this motion.

### B. *General Principles.*

The starting point is California Rules of Professional Conduct, Rule 3 –3 10 ("Avoiding the Representation of Adverse Interests"). It provides, in relevant part,

> (E) "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment."

The definitions of two key terms in subsection (E) are set forth in subsections (A)(1) and (A)(2), as follows:

"Disclosure" means informing the client or former client of the relevant circumstances and of the actual and reasonably foreseeable adverse consequences to the client or former client. Cal. R. Prof. Conduct, R. 3–310(A)(1).

"Informed written consent" means the client's or former client's written agreement to the representation following written disclosure. Cal. R. Prof. Conduct, R. 3–310(A)(2).

How is Rule 3–310 construed and applied? What is the remedy if it has been violated? Numerous cases deal with these questions. Instead of formulating anew what many courts previously have articulated, I will quote extensively from the California Supreme Court's most recent opinion on these issues.

In *City and County of San Francisco v. Cobra Solutions Inc.*, 38 Cal.4th 839, 43 Cal.Rptr.3d 771, 135 P.3d 20 (2006), the Supreme Court held that San Francisco's City Attorney had a personal conflict in a case his office was handling and that because of his unique position as ultimate policymaker and as supervisor of all the other attorneys, as well as the "compelling societal interest in preserving the integrity of the office of a city attorney," the entire Office of the City Attorney had to be disqualified. *Id.* at 853–54, 43 Cal.Rptr.3d 771, 135 P.3d 20. The key issue in *Cobra Solutions* was not whether the City Attorney had a conflict (it was undisputed that he did) but whether instead of recusing his entire office an ethical wall would suffice. Before addressing that issue the Supreme Court reviewed the fundamental jurisprudence relating to conflicts in the following manner.[5] It stated,

The authority of a trial court "to disqualify an attorney derives from the power inherent in every court '[t]o con-

trol in furtherance of justice, the conduct of its ministerial officers.' " (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*, 20 Cal.4th 1135, 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371 (1999) (*SpeeDee*), quoting Code Civ. Proc., § 128, subd. (a)(5).) "Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility." (*SpeeDee*, at 1145, 86 Cal. Rptr.2d 816, 980 P.2d 371.) As we have explained, however, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." (Ibid.)

When disqualification is sought because of an attorney's successive representation of clients with adverse interests, the trial court must balance the current client's right to the counsel of its choosing against the former client's right to ensure that its confidential information will not be divulged or used by its former counsel.

\* \* \* \* \* \*

Two ethical duties are entwined in any attorney-client relationship. First is the attorney's duty of confidentiality, which fosters full and open communication between client and counsel, based on the client's understanding that the attorney is statutorily obligated (Bus. & Prof. Code, § 6068, subd. (e)) to maintain the client's confidences.(*SpeeDee, supra*, 20 Cal.4th at 1146, 86 Cal.Rptr.2d 816, 980 P.2d 371.) The second is the attorney's duty of undivided loyalty to the client. (*Flatt v. Superior Court*, 9 Cal.4th 275, 282, 36 Cal.Rptr.2d 537, 885 P.2d 950 (1994) (*Flatt* ).) These ethical duties are

---

5. The quote that follows retains the citational style and methods that California state courts use.

mandated by the California Rules of Professional Conduct ... That enduring duty to preserve client confidences precludes an attorney from later agreeing to represent an adversary of the attorney's former client unless the former client provides an "informed written consent" waiving the conflict. (Rules Prof. Conduct, rule 3–310(E).) If the attorney fails to obtain such consent and undertakes to represent the adversary, the former client may disqualify the attorney by showing a " 'substantial relationship' " between the subjects of the prior and the current representations. (*Flatt, supra,* 9 Cal.4th at 283, 36 Cal. Rptr.2d 537, 885 P.2d 950.) To determine whether there is a substantial relationship between successive representations, a court must first determine whether the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation. (*Jessen v. Hartford Casualty Ins. Co.,* 111 Cal.App.4th 698, 710–711, 3 Cal. Rptr.3d 877 (2003) .) If the former representation involved such a direct relationship with the client, the former client need not prove that the attorney possesses actual confidential information. (*Id.* at 709, 3 Cal.Rptr.3d 877.) Instead, the attorney is presumed to possess confidential information if the subject of the prior representation put the attorney in a position in which confidences material to the current representation would normally have been imparted to counsel. (*Flatt, supra,* 9 Cal.4th at 283, 36 Cal. Rptr.2d 537, 885 P.2d 950; *Adams v. Aerojet–General Corp.,* 86 Cal.App.4th 1324, 1332, 104 Cal.Rptr.2d 116 (2001); *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.,* 229 Cal.App.3d 1445, 1453–1454, 280 Cal.Rptr. 614 (1991).) When the attorney's contact with the prior client was not direct, then the court examines both the attorney's relationship to the prior client and the relationship between the prior and the present representation. If the subjects of the prior representation are such as to "make it likely the attorney acquired confidential information" that is relevant and material to the present representation, then the two representations are substantially related. (*Jessen v. Hartford Casualty Ins. Co., supra,* 111 Cal. App.4th at 711, 3 Cal.Rptr.3d 877; see *Farris v. Fireman's Fund Ins. Co.,* 119 Cal.App.4th 671, 680, 14 Cal.Rptr.3d 618 (2004) [material confidential information is that which is "directly at issue in" or has "some critical importance to, the second representation"].) When a substantial relationship between the two representations is established, the attorney is automatically disqualified from representing the second client. (*Flatt, supra,* 9 Cal.4th at 283, 36 Cal.Rptr.2d 537, 885 P.2d 950; see Hazard and Hodes, *The Art of Lawyering* (3d ed.2000 & 2005–2 supp.) § 13.5, pp. 13–12–13–13.)

*Cobra Solutions,* 38 Cal.4th at 846–847, 43 Cal.Rptr.3d 771, 135 P.3d 20.

**C.** ***In MySpace's Document Requests 97 and 153–162, as Well as its Proposal for the Joint Stipulation, OMM Sought Discovery Substantially Related to its Prior Representation of UMG.***

Long ago, the Ninth Circuit stated that "If there is a reasonable probability that confidences were disclosed [in an earlier representation] which could be used against the client in [a] later, adverse representation, a substantial relation between the cases is presumed." *Trone v. Smith,* 621 F.2d 994, 998 (9th Cir.1980) (reversing trial court's refusal to disqualify a law firm). That pronouncement was reiterated

in *Merle Norman Cosmetics, Inc. v. United States District Court*, 856 F.2d 98, 101 (9th Cir.1988) and *In re County of Los Angeles*, 223 F.3d 990, 994 (9th Cir.2000). California state court decisions issued after *Trone* also posited client confidentiality as the key determinant of whether a "substantial relationship" existed, although they sometimes phrased the test somewhat differently. *See e.g., Flatt v. Superior Court*, 9 Cal.4th 275, 283, 36 Cal. Rptr.2d 537, 885 P.2d 950 (1994); *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*, 229 Cal.App.3d 1445, 1452, 280 Cal. Rptr. 614 (1991). The test is necessarily fact-dependent. *Ahmanson* acknowledged that, "The word 'substantial,' like other nonquantifiable denominations of measurement, is subject to a variety of interpretations. Use of the word 'relationship' implies a connection, but offers no guidance as to *what* is being connected: subject-matters, facts or issues," *Id.* at 1453, 280 Cal.Rptr. 614. According to one court, *Flatt v. Superior Court, supra,* "effectively select[ed] the first of the *Ahmanson* alternatives." *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal.App.4th 698, 711, 3 Cal.Rptr.3d 877 (2003). As *Jessen* also noted, "The *Ahmanson* court felt that its formula protected the confidences of the former client when the 'attorney has been in a position to learn them' but did not require disqualification 'when there is no realistic chance that confidences were disclosed.'" *Id.* at 708, 3 Cal.Rptr.3d 877.

Here, OMM's discovery requests and responses were substantially related to *all* of the *Ahmanson* criteria: the matter, the facts *and* the issues of its prior representation of UMG. On July 9, 2007, OMM itself attempted to justify Request No. 97 by arguing that "Documents demonstrating [UMG's] attempts to collude with other copyright holders to control or otherwise monopolize portfolios of copyrighted materials are directly relevant to [MySpace's copyright misuse affirmative] defense."

This assertion revealed that OMM was going after information showing UMG had colluded with other copyright licensors, in violation of the antitrust laws. The adversaries of UMG in the Hummer Winblad matter had alleged such misconduct, and OMM had worked with, and on behalf of, UMG in refuting that allegation. OMM's previously-served Document Request No. 153 was even more explicit: it straight out demanded documents that UMG had produced in the *Napster Copyright* litigation, many of which were indisputably already in OMM's files.

### D. *Must OMM Be Disqualified, Notwithstanding the Ethical Wall it Erected?*

OMM set up a "screen" before this dispute arose, and UMG does not contend, nor on this record is there any basis for it to contend, that the OMM attorneys who worked on the Hummer Winblad matter are now working for MySpace against UMG or have disclosed confidential information to those of their colleagues who are. What is the effect of that screen?

In *Flatt v. Superior Court*, 9 Cal.4th 275, 283, 36 Cal.Rptr.2d 537, 885 P.2d 950 (1994), the California Supreme Court stated in dicta that "[i]f an attorney is disqualified because he formerly represented and therefore possesses confidential information regarding the adverse party in the current litigation, vicarious disqualification of the entire firm is compelled as a matter of law." Whether that is still the rule in California is somewhat uncertain, given the California Supreme Court's somewhat casual observation in *People v. SpeeDee Oil Change Systems, Inc.*, 20 Cal.4th 1135, 1151, 86 Cal.Rptr.2d 816, 980 P.2d 371 (1999) that " . . . [W]e need not consider whether an attorney can rebut a presumption of shared confidences, and avoid disqualification, by establishing that the firm

imposed effective screening procedures."
*See also Adams v. Aerojet–General Corporation,* 86 Cal.App.4th 1324, 1336, 1340, 104 Cal.Rptr.2d 116 (2001) ("Disqualification based on a conclusive presumption of imputed knowledge derived from a lawyer's past association with a law firm is out of touch with the present day practice of law.... [D]isqualification should not be ordered where there is no reasonable probability the firm-switching attorney had access to confidential information while at ... [the] former firm that is related to the current representation."); *In re County of Los Angeles,* 223 F.3d 990, 996–97 (9th Cir.2000) (construing *SpeeDee Oil* to indicate that the California Supreme Court "may be inclined to follow the path taken by other federal courts"—*i.e.,* to adopt the approach of the American Bar Association Model Rules of Professional Conduct, which permits a firm to erect ethical walls to avoid disqualification). I concur in the Ninth Circuit's tacit prediction that California courts may well approve that practice, given the ever-escalating frequency of attorneys shifting firms, firms merging or being acquired by other firms, firms opening offices in numerous cities and foreign jurisdictions, and firms expanding into "mega-firm" size, sometimes with more than a thousand lawyers. Nevertheless, in *Cobra Solutions* the Supreme Court did not abandon the concept of imputed knowledge and it *did* disqualify the entire Office of City Attorney, although for reasons not entirely applicable here. In short, the *Flatt* "automatic disqualification" concept is still on the books. Because it is, and under the other established jurisprudence cited in *Cobra Solutions, supra,* the Court's finding above that the two engagements of OMM were "substantially relat-

ed" ordinarily would result in the disqualification of OMM.

**E. *Does OMM's Purported and Belated Abandonment of the Antitrust–Based Copyright Misuse Affirmative Defense Entitle it to Remain as Counsel for Myspace?***

**1. OMM's Disclaimer.**

As noted above, on October 23, 2007, OMM served notice of a "Supplemental Response" to UMG's Interrogatory No. 12. The Supplemental Response purported to scrap the factual basis and theories that led to UMG's motion to disqualify OMM.[6] UMG argues that the Supplemental Response should be disregarded because: (1) OMM reserved the "right to amend or supplement its responses," failed to dismiss the affirmative defense with prejudice and did not represent that MySpace would drop "altogether and irrevocably" its antitrust-based allegations and misuse theory, despite the Court's invitation that it do so. (2) The disclaimer encompasses only the *identical* theories of copyright misuse based on the *identical* facts asserted in the Hummer Winblad matter, instead of all matters "substantially related" to that matter. (3) The Supplemental Response does not purport to bind OMM's second client in this case, defendant News Corp. (4) The July 1, 2005 cutoff date referred to in the disclaimer does not encompass some inquiry the DOJ supposedly opened in 2006.(5) The disclaimer is conditioned upon OMM remaining counsel of record, so if MySpace chooses to replace OMM with another firm, such as the Susman firm, UMG could be confronted with the problem all over again.

---

6. The relevant portion of the Supplemental Response (*i.e.,* the disclaimer) is attached hereto as Exhibit A.

UMG's rejection of OMM's withdrawal of the conflict-tainted bases for its affirmative defense reflects a too-literal and somewhat unrealistic assessment of the language of the Supplemental Response. For example, OMM's routine, boilerplate reservation of the right to amend the response sensibly should be understood to refer only to the right to amend the reconfigured affirmative defense, not a right to reassert the abandoned one. Similarly, item eleven of the disclaimer *does* explicitly recognize that the disclaimer should be given a "wide berth" in recognition of the purpose of the "substantially related" principle. Nor does OMM's omission of any reference to News Corp. really matter; that defendant will be bound by this Order too (as will be seen). Moreover, because UMG could not and did not anticipate that the Court would exercise its power to impose equitable conditions on OMM's representation, UMG's rejection of the Supplemental Response fails to recognize that there is a way to achieve a balanced resolution of the respective rights of both clients—UMG *and* MySpace.

In short, the Court concludes that when construed and enforced in the following manner, OMM's Supplemental Response effectively cures the conflict and entitles OMM to remain on the case.

### 2. The Court's Power to Condition Denial of a Recusal Motion on Prophylactic and Equitable Measures.

 The authority of a trial court "to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers.'" *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*, 20 Cal.4th 1135, 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371 (1999) (quoting Cal.Civ.Proc.Code § 128(a)(5)). The converse of that principle is that the same "inherent power" also entitles the Court to deny a disqualification motion on condition that the attorney or firm in question comply with certain limitations. This is because a court's authority to disqualify an attorney or craft appropriate relief to punish or deter attorney misconduct derives from the court's equitable powers. *See Geoffrey C. Hazard, Jr. & W. William Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* § 4.7, at 4–22 (Aspen, 3d ed. 2007) ("Former clients in particular often pursue motions to disqualify their former counsel from adverse representation. Such motions ... invoke the equitable powers of the court, and when successful result in an order that is in effect an injunction. Hence, ... a motion for disqualification is governed by such equitable principles as waiver, estoppel, latches, 'undue hardship' and 'a balancing of the equities.' This helps explain why courts sometimes deny relief on motion for disqualification, even when there is clear proof of violation of a rule of professional conduct.").

 "Because disqualification is a drastic measure, it is generally disfavored and should only be imposed when absolutely necessary." *Concat LP v. Unilever, PLC*, 350 F.Supp.2d 796, 814 (N.D.Cal.2004). *See also Shurance v. Planning Control Intern., Inc.*, 839 F.2d 1347, 1349 (9th Cir. 1988) ("Because of this potential for abuse, disqualification motions should be subjected to particularly strict judicial scrutiny.") (internal quotation omitted). As stated in Richard E. Flamm, *Lawyer Disqualification: Conflicts of Interest and Other Bases* § 23.1 at 443–45 (Banks and Jordan, 2003),

> "Courts have begun to register growing dissatisfaction with the use of disqualification as a remedy for ethical misconduct. It has been recognized that ... judicial entry into the field of lawyer ethics through the medium of motions to

disqualify has not been a salutary development. In part for this reason, it has been said that courts should not apply the ethical rules in a way that is mechanical, didactic, or inflexible. Courts have been admonished to take a 'functional' approach, pursuant to which disqualifications are evaluated with a keen sense of practicality ...." (citations deleted)

The discretion courts have to determine whether the specific facts of a case warrant a sanction short of disqualification is broad indeed:

[E]ven when the court has misgivings about the conduct of the challenged attorney, it is not obligated to disqualify that lawyer merely because he has run afoul of the applicable ethical rules. The court is encouraged instead to examine the specific facts and circumstances peculiar to the individual case to decide whether disqualification, or some lesser sanction, would be an appropriate remedy. In other words, even when counsel has been shown to have committed an ethical rule infraction the court retains discretion to decline to order disqualification, and, in many cases, courts have done just that.

*Id.* at § 23.3 at 449–50 (citations deleted).

■ California courts have found that sanctions less severe than disqualification, such as the imposition of attorney's fees, may be appropriate. *See Neal v. Health Net, Inc.,* 100 Cal.App.4th 831, 844, 123 Cal.Rptr.2d 202 (2002) (reversing trial court's disqualification order and stating that "[r]ather than disqualification of counsel, other sanctions can suffice. Client confidences can be protected from unwarranted public disclosure by less drastic measures such as: protective orders, limiting the admission of evidence; in camera proceedings; the use of sealed records; payment of attorney fees and costs; and disciplinary sanctions through the State Bar of California in appropriate circumstances") (citation omitted); *Gregori v. Bank of America,* 207 Cal.App.3d 291, 308–09, 254 Cal.Rptr. 853 (1989) (affirming order denying disqualification and stating that "[T]he purpose of a disqualification order must be prophlylactic, not punitive ... Thus, disqualification is inappropriate simply to punish a dereliction that will likely have no substantial continuing effect on future judicial proceedings ... There are other sanctions which in that situation must suffice, including imposition of attorney's fees and costs incurred by the other side as a result of the misconduct.") (citation omitted).

### 3. Why Disqualification Is Not Necessary Here.

■ To start with, California courts have often recognized that "Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility." *SpeeDee Oil Change Systems,* 20 Cal.4th at 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371. Here, it is likely that the "need to maintain ethical standards" will be fully vindicated if OMM and the Susman firm are precluded from pursuing any claim substantially related to the Hummer Winblad matter and if MySpace is required to reimburse UMG for its attorney's fees. Nor will UMG be disadvantaged.

The controversy about the copyright misuse affirmative defense is collateral to what this case is about. As the Court stated at the hearing, "the relation [between the now-abandoned antitrust-based affirmative defense and the prior Hummer Winblad matter] is substantial ... [but] it's not substantial in terms of what's at stake in the lawsuit." At the hearing, counsel for UMG displayed admirable candor and professionalism in acknowledging this factor; he agreed that the antitrust-based copyright misuse affirmative de-

fense (which has now been withdrawn) did not "ha[ve] anything to do with the guts of this case" and he echoed what the Court had said: "The affirmative defense and the discovery relating to it is a very tiny tail on a much bigger dog. . . ." Counsel for UMG also agreed that if OMM "dropped the defense completely . . . we would have no objection to O'Melveny continuing." Moreover, he candidly acknowledged that those claims could "be made independently by some other truly independent firm." [7]

■ On motions to disqualify, "the paramount concern . . . [is] to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *SpeeDee Oil Change, supra,* 20 Cal.4th at 1145, 86 Cal.Rptr.2d 816, 980 P.2d 371. Most of the cases that apply that standard in ordering disqualification reflect a paradigm that is absent here: the attorney obtained confidential information about a party while associated with one firm, and then switched to another firm that already was representing that client's adversary. E.g., *Lucent Technologies, Inc. v. Gateway, Inc.,* 2007 WL 1461406 (S.D.Cal.2007) and *I–Enterprise Co. LLC v. Draper Fisher Jurvetson Management V, LLC,* 2005 WL 757389 (N.D.Cal.2005). This case is not like that. Nor is this a situation like *Jessen v. Hartford Cas. Ins. Co, supra,* where the attorney in question provided ongoing advice to a client over many years while at one firm, left that firm and later

sued his former client on behalf of a new client. In contrast, here no OMM attorney working on this case previously represented UMG in *any* matter, much less against MySpace. Nor does this case involve concurrent representation, unlike *Visa U.S.A., Inc. v. First Data Corporation,* 241 F.Supp.2d 1100 (N.D.Cal.2003); OMM's representation of MySpace did not commence until *after* its representation of UMG ended. Indeed, OMM developed and implemented an "ethical wall" some seven months *before* the events that led UMG to complain of the alleged conflict, unlike in *Lucent Technologies, supra* and *Concat LP v. Unilever, PLC,* 350 F.Supp.2d 796 (N.D.Cal.2004). Moreover, that wall has not been breached. UMG has proffered no evidence that any of the nineteen OMM attorneys who worked on the Hummer Winblad matters, including the matter before the DOJ, has worked on this case or in any way communicated confidential UMG information to the OMM attorneys staffing this case. It is true that the presumptions referred to in the lengthy citation from *Cobra Solutions, supra,* entitle UMG to assert that the confidentiality of its disclosures to OMM in the Hummer Winblad matter has been jeopardized, but the "dereliction of [OMM] . . . will likely have no substantial continuing effect on future judicial proceedings." *Gregori, supra,* 207 Cal.App.3d at 309, 254 Cal.Rptr. 853.

---

**7.** Although the Susman firm did not commit any wrong, it cannot be viewed as truly independent, and even if it were to take over total control of the representation of defendants, with OMM relieved of all duties, the Court would not permit the Susman firm to assert the now-withdrawn claim. That these two law firms practice separately and may have been asked to undertake different responsibilities does not matter. Too many questions would linger about whether the Susman firm properly could be deemed independent of OMM. Cf. *Pound v. DeMera DeMera Cameron,* 135 Cal.App.4th 70, 36 Cal.Rptr.3d 922

(2005). Thus, it is noteworthy that a Susman lawyer (Morrissey) drafted the document demand (Request 153) which sought the documents already in OMM's files, but the Susman firm did not serve that demand on UMG; instead, an OMM attorney signed and served it. For some reason, later on OMM tried to minimize the problem by attributing the entire handling of the antitrust issues to Susman. Even at the hearing, counsel for OMM could not clarify, despite the Court's requests, how the Susman firm and Mr. Morrissey came to draft the items that triggered this motion.

On the other hand, in principle MySpace has a right to retain OMM as its counsel, and it obviously is intent on doing so, given that it has vigorously opposed UMG's motion. Courts also have an interest in preserving the continuity of the lawyer-client relationship; otherwise, if such relationships were easily disrupted, complicated cases such as this would take even longer to resolve, the costs of litigation would be even higher, and unscrupulous attorneys would have an incentive to seize on strained facts and theories to pursue the tactical advantage of ousting their adversary's lawyers.

Nor has OMM otherwise displayed dubious conduct in its relationship with UMG. Indeed, right from the beginning, OMM made it crystal clear that it would not agree to represent UMG unless the latter agreed "to waive any conflict or rule that would prevent [OMM] from representing a party whose interests are adverse to UMG in pending or future cases that concern infringement of intellectual property rights on the Internet, such as the defendant in the *UMG v. Grouper Networks, Inc.* matter." The *Grouper* case is in many respects almost identical to this case. Thus, OMM put UMG on notice that OMM might represent a social networking website such as MySpace if UMG were to sue such an entity. UMG agreed that OMM could do so, even if UMG were still an active, ongoing client of OMM. (That would not entitle OMM to pursue "substantially related" claims against UMG, however.) To disqualify OMM now would lead to a harsh result, given the minor nature of the conflict and—most importantly—the fact that OMM has agreed to abandon the claims and efforts that gave rise to its conflict.

Nevertheless, there are several reasons why, as a condition of being allowed to remain counsel of record, OMM should be required to reimburse UMG for the rea-

sonable fees that it incurred in pursuing this motion.

● OMM's interpretation of the meaning and scope of the waiver that OMM obtained from UMG was flatly unreasonable and inconsistent with its duty of loyalty to its former client. See *Flatt, supra,* 9 Cal.4th at 282, 36 Cal. Rptr.2d 537, 885 P.2d 950. OMM had no business construing the term "Hummer Winblad matter" as narrowly as it did, which would have excluded OMM's 2006 representation of UMG before the Department of Justice. OMM had treated the *In re Napster* and DOJ issues as interrelated, it had prepared only one monthly bill encompassing its work on both issues, and the key OMM lawyers working on those two clearly-entwined "legal fronts" had communicated with each other as part of their respective efforts. OMM persisted in asserting this untenable proposition not only in its informal communications with UMG's counsel, but in its papers on this motion and even at the hearing (albeit rather half-heartedly). Such a baseless argument was unworthy of a distinguished law firm that is undoubtedly proud of the fine reputation it has enjoyed for many decades.

● Equally unfounded was OMM's short-lived argument that UMG had agreed to allow OMM to represent MySpace even if OMM had obtained confidential information relevant to the affirmative defense.

● The effort by OMM to attribute responsibility for the antitrust-based copyright misuse defense solely to the Susman firm also was misplaced, to say the least.

● OMM's July 31, 2007 withdrawal of Document Requests 97 and 153–163, following UMG's demand that it withdraw as counsel, was less than candid

and did not really address the problem, because it indicated that MySpace would re-propound the relevant discovery through the Susman firm.

- UMG asked OMM to withdraw on July 12, 2007. Instead of responding straightforwardly to the effect that it did not want to pick a fight with UMG and it would withdraw the discovery requests and responses at issue, OMM waited a few days and then merely sent UMG what it euphemistically characterized as a "reformatted" copy of the proposed stipulation. What was "reformatted"? Nothing, except that MySpace's contention that evidence of UMG's alleged collusion with other copyright holders was "directly relevant" to its affirmative defense was dropped.

- Even in its post-hearing Supplemental Response OMM did not go the full distance to remove the conflict of interest problem from the picture (although the Court's precise conditions for allowing OMM to stay on the case, set forth below, should fix the problem.)

- UMG did not file this motion in order to obtain an improper tactical advantage. It permitted OMM to represent MySpace without objection for several months. Only after late June and early July 2007, when it was served with the discovery requests and responses relating to MySpace's copyright misuse affirmative defense, did UMG challenge OMM's representation of MySpace.

### F. *Conclusion*

For the foregoing reasons, the Court DENIES UMG's motion to disqualify O'Melveny & Myers as Defendants' counsel, provided that MySpace and News Corporation both accept all the following conditions:

1. Neither O'Melveny & Myers nor Susman Godfrey may pursue the claims, matters and discovery that were set forth in MySpace's Document Requests 97 and 153–162.

2. Neither O'Melveny & Myers nor Susman Godfrey may assert or pursue claims to the effect that attempts by UMG to collude with other copyright owners to control or otherwise monopolize portfolios of copyrighted materials are directly relevant to MySpace's copyright misuse affirmative defense. This condition extends to alleged collusive conduct that occurred before the last date that OMM performed any legal services on behalf of UMG in the Hummer Winblad matter.

3. Neither O'Melveny & Myers nor Susman Godfrey may assert claims or seek to conduct discovery into claims that are substantially related to the Hummer Winblad matter, which includes OMM's representation of UMG before the Department of Justice.

4. Defendants shall reimburse UMG for the reasonable attorneys fees and costs that UMG incurred in connection with this motion, starting from July 12, 2007 (when UMG requested that OMM step down as counsel) through November 30, 2007 (when UMG filed its last papers concerning this motion).[8]

8. The Court ORDERS UMG to provide the applicable billing information, redacted to preserve the attorney-client privilege, to Defendants. (According to Exhibit D to the November 30, 2007 Declaration of Benjamin Glatstein, UMG's counsel sought $197,000 "as partial reimbursement" of such fees and costs as of October 22, 2007.) Then the par-

If Defendants do not accept the foregoing conditions, the Court will grant UMG's motion. Defendants shall file a d not later than December 17, 2007.

IT IS SO ORDERED.

## EXHIBIT A

Further responding, MySpace states that none of its claims or defenses in this litigation, including its copyright misuse defense in this action, are or will be based upon the any of the following as long as O'Melveny & Myers LLP is counsel of record:

First, allegations that UMG made false or misleading statements to the United States Department of Justice ("DOJ") in the White Paper it submitted to the DOJ in December 2002;

Second, allegations that the firewalls at pressplay were ineffective or were breached;

Third, allegations that UMG, through pressplay, improperly shared licensing information (including the terms of third-party licenses) with other record labels;

Fourth, allegations that UMG is required to produce its privileged communications with its counsel related to the White Paper or the DOJ investigation in 2002;

Fifth, allegations that UMG colluded with any party (including Sony or any other record label) at any time before December 23, 2003 (the date on which the DOJ closed its 2002 investigation into UMG) to restrain competition in the market for the online distribution of music;

Sixth, any licensing agreements between UMG and third parties entered into before December 23, 2003;

Seventh, allegations that UMG engaged in any anti-competitive conduct before December 23, 2003, that would prevent UMG from enforcing its copyrights against MySpace or from recovering damages in this action;

Eighth, to the extent, if any, not already covered above, any of the allegations or issues alleged by Hummer Winblad Venture Partners in *In re Napster, Inc. Copyright Litigation*, USDC Case No. C–MDL–001369 and the related case of *UMG Recordings, Inc., et al. v. Hummer Winblad Venture Partners et al.*; USDC Case No. 03 C2785, and the appeal thereof (hereinafter "In re Napster");

Ninth, to the extent, if any, not already covered above, any issues related to Judge Patel's depublished and vacated April 21, 2006 Memorandum and Order entered in connection with Hummer Winblad's Motion to Compel Production of Privileged Documents in In re Napster;

Tenth, to the extent, if any, not already covered above, any allegations or issues related to the Department of Justice July 2001 Investigation regarding UMG and the Department of Justice Inquiry concerning, among other things, Judge Patel's depublished and vacated order.

Eleventh, to protect UMG's articulated interest in avoiding a "substantially related" subsequent representation by O'Melveny & Myers LLP while allowing the O'Melveny & Myers LLP MySpace litigation team to pursue its defense of the action without knowing the exact contours of the prior representation (which it is precluded from knowing by virtue of the ethical wall in place), to avoid any ambigui-

ties shall meet and confer to negotiate a stipulation about the precise amount to be reimbursed. If they fail to reach an agreement, instead of subjecting the Court to further motion practice, each side will be required to set forth its respective proposal and a short summary justifying it. The Court will then pick one of the competing amounts, as if in a "baseball arbitration."

ty with respect to whether an issue is "substantially related" to O'Melveny & Myers LLP's prior representation of UMG and to give wide berth to the conflict of interest by O'Melveny & Myers LLP asserted by UMG, any allegation that UMG collusively or otherwise improperly licensed or failed to license intellectual property rights for digital exploitation or used its copyrights to unlawfully restrain competition before July 1, 2005, a date that is more than a year and a half after the Department of Justice closed its investigation of UMG, more than two and a half years after the submission of the White Paper by UMG that was the subject of the DOJ's investigation, and also more than two and a half years after the date of the license agreements at issue in that White Paper.