223 F.3d 990 (9th Cir. 2000)
 In re: COUNTY OF LOS ANGELES;
In re: SCOTT HOGLUND COUNTY OF LOS ANGELES;
In re SCOTT HOGLUND, Petitioners,
v.
UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, Respondent,
JAMES FORSYTH, Real Party in Interest.
 No. 00-70077
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Submitted April 19, 2000* Pasadena, California
Filed August 31, 2000
 Alan Diamond, Greines, Martin, Stein & Richland, Beverly Hills, California, for the petitioners.
 Stephen Yagman, Marion R. Yagman, Kathryn S. Bloomfield, Yagman Yagman & Reichmann, Venice, California, Professor Erwin Chemerinksky, The Law School, University of Southern California, Los Angeles, CA, for the real party in interest.
 Petition for Writ of Mandamus to the United States District Court for the Central District of California; Florence Marie Cooper, District Judge Presiding. D.C. No. CV-98-07731-FMC
 Before: Alex Kozinski, Ferdinand F. Fernandez and Pamela Ann Rymer, Circuit Judges.
 KOZINSKI, Circuit Judge.
 
 
 1
 James Forsyth, the plaintiff in the underlying case, Forsyth v. County of Los Angeles, CV-98-7731-FMC (CWx), is represented by attorney Stephen Yagman and the law firm of Yagman & Yagman & Reichmann. Joseph Reichmann is a retired United States Magistrate Judge who, five years ago, presided over settlement negotiations in Thomas v. County of Los Angeles, CV-93-5390-JSL (JRx). Forsyth and Thomas are police brutality cases, arising out of different incidents separated in time by several years. They are related only in the sense that the County of Los Angeles and one of its deputy sheriffs, Scott Hoglund, are defendants in both cases.
 
 
 2
 Defendants moved to disqualify the Yagman firm on the ground that, during the settlement negotiations in Thomas, Reichmann met with defense counsel ex parte and therefore had access to confidential information pertaining to the County of Los Angeles and Deputy Sheriff Hoglund. Yagman did not contest the disqualification of Reichmann but proffered the following evidence: Reichmann joined the Yagman firm as a partner on November 1, 1999, and has had no involvement in the Forsyth case. Moreover, a week before Reichmann joined the firm, Stephen Yagman removed all of the files pertaining to the case to his home and instructed the firm's only other lawyer, partner Marion Yagman, not to discuss the case with Reichmann. Reichmann himself submitted a declaration stating that he had no recollection of the settlement discussions in Thomas, and that he does not recall having received any confidential information from defendants' lawyer in that case. Reichmann, moreover, explained that "as a magistrate judge from 1980 to 1996, it was my longstanding, regular, and continuing practice in conducting settlement conferences (1) not to go into the merits of actions, (2) not to request or receive either confidential or strategic information from counsel, and (3) to discuss only monetary matters." Reichmann Decl. at 2, Ex. 6 to Pet. for Writ of Mandamus.
 
 
 3
 For their part, defendants submitted the declaration of Richard Kemalyan, defense counsel in Thomas, who stated as follows: "I do not have a specific recollection of the details of what communications were made between declarant and Magistrate Judge Reichman [sic] outside the presence of plaintiff's counsel. I am sure that in the normal course of the Settlement Conference, I did have private and confidential communications with Magistrate Judge Reichman [sic]. I cannot recall the details of those communications." Kemalyan Decl. at 1, Ex. 5 to Pet. for Writ of Mandamus.
 
 
 4
 The district court denied the motion to disqualify the Yagman firm, finding no evidence that Reichmann received confidential information during the settlement negotiations in Thomas. The court also found that the wall of confidentiality erected to shield Reichmann from the Yagmans was adequate to protect the interests of the defendants. Defendants brought this petition for a writ of mandamus seeking reversal of the district court's order and disqualification of the Yagman firm. We stayed the trial while we considered the petition. See County of Los Angeles v. United States Dist. Court, No. 0070077 (9th Cir. Jan. 31, 2000) (unpublished order).
 
 
 5
 Until recently, the practice of judicial officers returning to law firms was rare, and the relevant authorities are sparse. The case law draws a distinction between situations where a judicial officer acted merely as an adjudicator and those where he acted as a mediator or settlement judge. The difference is based on the fact that mediators are far more likely thanadjudicators to learn confidential information from the parties:
 
 
 6
 [Mediation] . . . differs significantly from more formal adversarial proceedings at which an adjudicative officer presides. Most importantly, the mediator is not merely charged with being impartial, but with receiving and preserving confidences in much the same manner as the client's attorney. In fact, the success of mediation depends largely on the willingness of the parties to freely disclose their intentions, desires, and the strengths and weaknesses of their case; and upon the ability of the mediator to maintain a neutral position while carefully preserving the confidences that have been revealed . . . .
 
 
 7
 Adversarial proceedings, on the other hand, are characterized by vigorous attempts to maintain confidences. Attorneys who have received such confidential information are under a strict duty to avoid, without the consent of the client, any disclosures of that information. And because adjudicators do not occupy a relationship of confidence and trust with the parties akin to that occupied by the attorneys, they do not, for the most part, have access to those confidences. Thus, although mediators function in some ways as neutral coordinators of dispute resolution, they also assume the role of a confidant, and it is that aspect of their role that distinguishes them from adjudicators.
 
 
 8
 Poly Software Int'l., Inc. v. Su, 880 F. Supp. 1487, 1494 (D. Utah 1995) (footnote omitted).
 
 
 9
 Adjudicators do sometimes become privy to confidential information, such as when they must rule on claims of privilege. However, the distinction between adjudicators and mediators is useful in most cases. Thus, when a judicial officer who served as an adjudicator returns to practice, his participation as a lawyer will normally be constrained only by Rule 1.12(a) of the Model Rules of Professional Conduct, which provides: "[A] lawyer shall not represent anyone in connection with a matter in which the lawyer participated personally and substantially as a judge or other adjudicative officer . . . unless all parties to the proceeding consent after consultation."[1] Disqualification pursuant to this rule is personal, not vicarious. This means that, though the lawyer himself is automatically disqualified, his law firm may serve as counsel, so long as an ethical wall has been erected to bar the disqualified lawyer from any participation in the case. See Higdon v. Superior Court, 227 Cal. App. 3d 1667, 1680 (1991).
 
 
 10
 The rule is quite different for a judge who has participated in mediation or settlement efforts, or who has otherwise received confidential information from the parties in a case. As explained in Poly Software, such a judge becomes a confidant of the parties, on a par with the parties' own lawyers. Under those circumstances, the judge will be conclusively presumed to have received client confidences in the course of the mediation,[2] andhis later participation in the case will be governed by the same rule that governs lawyers: He may not participate in the case and, pursuant to Model Rules of Professional Conduct Rule 1.10(a), neither may his law firm. See Cho v. Superior Court, 39 Cal. App. 4th 113, 125 (1995) ("When a litigant has bared its soul in confidential settlement conferences with a judicial officer, that litigant could not help but be horrified to find that the judicial officer has resigned to join the opposing law firm--which is now pressing or defending the lawsuit against that litigant."); see also McKenzie Constr. v. St. Croix Storage Corp., 961 F. Supp. 857, 85962 (D.V.I. 1997).
 
 
 11
 The law firms facing disqualification in Cho and McKenzie were handling the very cases over which the former judges had presided. See Cho, 39 Cal. App. 4th at 126; McKenzie, 961 F. Supp. at 862. Our situation is different because Reichmann presided as settlement judge over a case other than the present one. Presuming that Reichmann learned confidential information as settlement judge in Thomas, it doesn't follow that any of that information pertains to Forsyth. When the two cases involve different parties and/or different incidents, disqualification of the former judge and his law firm is appropriate only if the two cases are "substantially factually related." Poly Software, 880 F. Supp. at 1494. This standard is derived from Rule 1.9 of the Model Rules of Professional Conduct, which deals with the question of when an attorney is disqualified from representing a client because the attorney previously represented a party adverse to the client in a related case. See Rosenfeld Constr. v. Superior Court, 235 Cal. App. 3d 566, 577 (1991). As we have concluded, a judge who participates in a mediation or presides over settlement negotiations gains access to confidential client information, just as if he were a lawyer for one of the parties. Because the "substantially factually related" standard is a proxy for the disclosure of confidential information, it makes sense to use the same standard to determine when a settlement judge will be disqualified in a related case.
 
 
 12
 We explained the "substantially factually related" standard in Trone v. Smith, 621 F.2d 994, 998 (9th Cir. 1980): "If there is a reasonable probability that confidences were disclosed [in an earlier representation] which could be used against the client in [a] later, adverse representation, a substantial relation between the two cases is presumed. " Id. (emphasis added). To determine whether Thomas and Forsyth are sufficiently related, we must decide whether "there is a reasonable probability" that the confidences we presume were disclosed during the settlement discussions in Thomas would be useful to the plaintiff in Forsyth. Id. This inquiry calls for a careful comparison between the factual circumstances and legal theories of the two cases. See id. at 999-1000; Poly Software, 880 F. Supp. at 1493; cf. Rosenfeld , 235 Cal. App. 3d at 576-77 (ordering lower court to develop record as to "substantial relationship"). We cannot, on the record before us, determine whether Forsyth and Thomas are substantially related.
 
 
 13
 Yet, we need not leave this matter unresolved and open for future dispute, which would further delay resolution of the underlying litigation. We will assume the two cases are substantially related, so Reichmann is presumed to have learned confidential information in Thomas that is relevant to Forsyth. This, in turn, will give rise to the further presumption thathe shared those confidences with the Yagman firm. If this latter presumption is irrebuttable, "the firm as a whole is disqualified whether or not its other members were actually exposed to the information" Reichmann learned from the earlier case. Trone, 621 F.2d at 999. Our court has not yet decided whether a law firm can rebut the presumption of shared confidences by taking prophylactic measures, such as building an ethical wall, to prevent the passing of information from the tainted lawyer to other members of the firm. See Paul E. Iacono Structural Eng'r, Inc. v. Humphrey, 722 F.2d 435, 442 (9th Cir. 1983); Trone, 621 F.2d at 999 n.4.
 
 
 14
 Because we apply state law in determining matters of disqualification, we must follow the reasoned view of the state supreme court when it has spoken on the issue. See Iacono Structural Eng'r, 722 F.2d at 439-40; see also C.D. Cal. Ch.7, Rule 1.2. For a long time, the California Supreme Court was silent as to whether the presumption of shared confidences is rebuttable, leaving the question to the state's intermediate appellate courts. The courts of appeal developed a general rule that the presumption is not rebuttable. See Henriksen v. Great Am. Sav. & Loan, 11 Cal. App. 4th 109, 114 (1992); Klein v. Superior Court, 198 Cal. App. 3d 894, 909 (1988).[3]
 
 
 15
 But the California Supreme Court has recently cast doubt on this approach. In People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc., 20 Cal. 4th 1135, 1151-52 (1999), an attorney represented one party while the firm where he was of counsel represented an adverse party to the same litigation. SpeeDee Oil presented a situation on all fours with appellate case law holding that the presumption of shared confidences is irrebuttable. See, e.g. , Cho, 39 Cal. App. 4th at 125; Henriksen, 11 Cal. App. 4th at 114. The supreme court, nevertheless, held that it "need not consider whether an attorney can rebut a presumption of shared confidences, and avoid disqualification, by establishing that the firm imposed effective screening procedures," SpeeDee Oil, 20 Cal. 4th at 1151, because the firm had failed to set up an effective screen. Observing that federal decisions have taken "a more lenient approach to conflicts disqualification than prevails in California," id. (citing federal cases), the court left open the possibility that screening can rebut the presumption of shared confidences within the firm. We read SpeeDee Oil as sending a signal that the California Supreme Court may well adopt a more flexible approach to vicarious disqualification.
 
 
 16
 SpeeDee Oil was the kind of case most likely to give rise to automatic disqualification because the same firm represented adverse parties in the same litigation. The California Supreme Court recognized that "discrete, successive conflicting representations in substantially related matters"--as are presented in our case--may pose less of a threat to the attorney-client relationship. Id. Magistrate Judge Reichmann joined the Yagman firm years after presiding over the Thomas settlement negotiations, and the Yagman firm does not seek to represent a party to the Thomas litigation. The current case, though we assume it to be related, involves largely different facts. These circumstances create an even more compelling case than SpeeDee Oil, where the court nonetheless refused to hold that the presumption is irrebuttable.
 
 
 17
 The vicarious disqualification of an entire firm can work harsh and unjust results, particularly in today's legal world where lawyers change associations more freely than in the past. A rule that automatically disqualifies a firm in all cases substantially related to the tainted lawyer's former representation could work a serious hardship for the lawyer, the firm and the firm's clients. See generally Geoffrey C. Hazard, Jr., & W. William Hodes, The Law of LawyeringS 1.10.207, at 336 (2d ed. Supp. 1997) (noting arguments in favor of adopting screening solution). An automatic disqualification rule would make firms be understandably more reluctant to hire mid-career lawyers, who would find themselves cast adrift as "Typhoid Marys," and clients would find their choice of counsel substantially diminished, particularly in specialized areas of law. Such a rule also raises the specter of abuse: A motion to disqualify a law firm can be a powerful litigation tactic to deny an opposing party's counsel of choice. See Manning v. Waring, Cox, James, Sklar & Allen , 849 F.2d 222, 224 (6th Cir. 1988) ("Unquestionably, the ability to deny one's opponent the services of capable counsel, is a potent weapon."). This is a case in point: Forsyth's counsel, Stephen Yagman, has a formidable reputation as a plaintiffs' advocate in police misconduct cases; defendants in such cases may find it advantageous to remove him as an opponent.
 
 
 18
 In the time since Trone left this question open, several of our sister circuits have held that a firm can rebut the presumption of shared confidences when it seeks to represent a party in a case substantially related to one in which a new member of the firm has participated. See, e.g., Manning, 849 F.2d at 224-26; Schiessle v. Stephens, 717 F.2d 417, 421 (7th Cir. 1983); Armstrong v. McAlpin, 625 F.2d 433, 445 (2d Cir. 1980) (en banc), vacated on other grounds and remanded, 449 U.S. 1106 (1981); see also Papanicolaou v. Chase Manhattan Bank, 720 F. Supp. 1080, 1086-87 (S.D.N.Y. 1989); United States ex rel. Lord Elec. Co. v. Titan Pac. Constr. Corp., 637 F. Supp. 1556, 1564-66 (W.D. Wash. 1986). The Model Rules also recognize that the increased mobility of lawyers between firms calls for a less rigorous application of the disqualification rules. See Model Rules of Professional Conduct, Rule 1.9 cmt. 3 (1983) ("If the concept of imputed disqualification were applied with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel.").
 
 
 19
 We would nevertheless accept the costs of automatic disqualification, if it were the only way to ensure that lawyers honor their duties of confidentiality and loyalty. But it is not. A client's confidences can also be kept inviolate by adopting measures to quarantine the tainted lawyer. An ethical wall, when implemented in a timely and effective way, can rebut the presumption that a lawyer has contaminated the entire firm. The Model Rules explicitly approve the use of screening procedures to avoid vicarious disqualification where a former judicial officer or government lawyer has joined the firm. See id. Rules 1.11(a)-(b), 1.12(c)(1); see also Higdon v. Superior Court, 227 Cal. App. 3d 1667 (1991) (allowing law firms that employ former judges to implement screening measures to avoid vicarious disqualification).
 
 
 20
 Here, Stephen Yagman removed all files concerning the Forsyth case from the law office before Reichmann joined the firm; all attorneys were instructed not to discuss the case with Reichmann. The district court found "ample evidence of appropriate screening measures: all members of the firm have declared that they have not discussed the pending case and that Reichmann does not have access to the case file." Order Denying Defs.' Mot. to Disqualify Pl.'s Counsel, Forsyth v. County of Los Angeles, No. 98-7731-FMC (CWx) (C.D. Cal. Dec. 21, 1999), at 6. We agreethat the measures taken by the Yagman firm adequately protect any legitimate interests of the defendants.
 
 
 21
 The changing realities of law practice call for a more functional approach to disqualification than in the past. In resolving this case, we take our cue from the California Supreme Court's recent indication that it may be inclined to follow the path taken by other federal courts. At the same time, we contradict no court of appeal decision directly on point. Cho, which is the closest to our fact pattern, involved a firm seeking to represent a party to the same litigation that a judge had mediated. We hold that the vicarious disqualification of a firm does not automatically follow the personal disqualification of a former settlement judge, where the settlement negotiations are substantially related (but not identical) to the current representation. Screening mechanisms that are both timely and effective, as the Yagman firm erected here, will rebut the presumption that the former judge disclosed confidences to other members of the firm. Because the district court here found that the ethical wall adopted by the Yagman firm was being scrupulously enforced and there is no reasonable possibility that confidential information will leak to Yagman from Reichmann, or vice versa, we find no basis on which to disqualify the Yagman firm from serving as counsel for plaintiff Forsyth.
 
 
 22
 DENIED.
 
 
 
 Notes:
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed. R. App. P. 34(a)(2).
 
 
 [1]
 Though the Model Rules of Professional Conduct have not been adopted as binding under California law (which governs here), see State Compensation Ins. Fund v. WPS, Inc., 70 Cal. App. 4th 644, 655-56 (1999), we rely on the Rules as persuasive authority. See Paul E. Iacono Structural Eng'r, Inc. v. Humphrey, 722 F.2d 435, 439 (9th Cir. 1983); see also Cho v. Superior Court, 39 Cal. App. 4th 113, 121 n.2 (1995); Higdon v. Superior Court, 227 Cal. App. 3d 1667, 1680 (1991).
 
 
 [2]
 The district court erred by inquiring whether confidential information actually passed from the parties to the mediator. As this case demonstrates, memories as to what transpired during these off-the-record proceedings are likely to be dim, making the fact-finding process highly perilous. More importantly, allowing an inquiry into what transpired during settlement negotiations will surely chill the candor of the parties in speaking to the mediator. Suffice to say that the mediation process inherently leads to the disclosure of confidential information, as Reichmann's declaration confirms. While Reichmann claims not to have requested or accepted confidential information during settlement negotiations, see page 10881 supra, he admits that he did discuss "monetary matters." Id. Information as to a party's bottom-line settlement position, or the degree of flexibility in settling a particular case, is itself a significant piece of information that the opposing party would love to have. In litigation, as in life, monetary matters are confidential matters.
 
 
 [3]
 The courts did not, however, apply this rule without exception. See Klein, 198 Cal. App. 3d at 909 (ethical rules do not "absolutely require vicarious disqualification" of a law firm); Chambers v. Superior Court, 121 Cal. App. 3d 893, 902-03 (1981) (allowing law firms that employ former government lawyers to rebut the presumption).