ADVANCED MESSAGING TECHNOLOGIES, INC., and J2 Global, Inc.,
Plaintiffs,

v.

EASYLINK SERVICES INTERNATIONAL CORPORATION,
Defendant.

**Case No. CV 11–04239 DDP (AJWx).**

United States District Court,
C.D. California.

Dec. 19, 2012.

Brian R. England, Edward Eric Johnson, Jopei Shih, Robert A. Sacks, Sullivan and Cromwell LLP, Los Angeles, CA, Frank L. Bernstein, Kenyon & Kenyon LLP, Palo Alto, CA, for Plaintiffs.

Manny J. Caixeiro, Perkins Coie LLP, New York, NY, Matthew F. Carmody, Steven M. Lubezny, Timothy J. Carroll, Perkins Coie LLP, Chicago, IL, Adrian M. Pruetz, Erica Jean Van Loon, Glaser Weil Fink Jacobs Howard Avchen and Shapiro LLP, Grant E. Kinsel, Gigi C. Hoang, Perkins Coie LLP, Brad D. Brian, Stuart N. Senator, Munger Tolles and Olson LLP, Edith R. Matthai, Robie and Matthai, Los Angeles, CA, David John Palmer, Perkins Coie LLP, Phoenix, AZ, Holmes J. Hawkins, III, Thomas C. Lundin, Jr, King & Spalding LLP, Atlanta, GA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO DISQUALIFY COUNSEL PERKINS COIE AND TO COMPEL DISCOVERY

DEAN D. PREGERSON, District Judge.

### I. *Introduction*

Plaintiff j2 Global Communications, Inc. has filed a Motion to Disqualify Counsel Perkins Coie and to Compel Discovery ("Motion") in three patent infringement cases ("the Three Current Cases") pending before this court. (Dkt. No. 77.)[1] Plaintiff Advanced Messaging Technologies, Inc. is a co-Plaintiff and co-movant in two of the cases (9–4150 and 11–4239) (Plaintiffs are collectively called "j2"). In each case, one or more of the following corporations is a defendant: Open Text Corporation ("Open Text") EasyLink Services International Corporation ("EasyLink"), and Captaris, Inc. ("Captaris") (collectively "Defendants"). Open Text owns Easy Link and Captaris. Perkins Coie ("Perkins") represents the Defendants. In late

---

1. The three case numbers are: 11–4239, 9–4189, and 9–4150. As each Motion essentially implicates the same issues in each case, all cites will be to the 11–4239 case, unless otherwise noted.

2011, Open Text contacted Crowell & Morning ("Crowell") about assigning one of its attorneys to temporarily serve as Open Text's outside in-house counsel for intellectual property matters. Crowell assigned an attorney ("the Attorney") to fill this role, even though a conflicts check revealed the Attorney formerly represented j2. In fact, he worked on cases on behalf of j2 that involved three of the four patents at issue in the Three Current Cases. As Open Text's outside in-house counsel, the Attorney had contact with Perkins. The court therefore disqualifies Perkins. This outcome is unfortunate, because there is not a molecule of evidence that Perkins did anything other than act with integrity and in a manner consistent with the highest traditions of the legal profession.

·In reaching its decision, the court has considered j2's *in camera* evidence, which includes billing records of the Attorney's work for j2, and various emails that the Attorney sent and received in the course of his j2 representation. (*In Camera* Evidence of Billing Records and Emails (*"In Camera* Evidence").)

## II. *Background*

### A. *The Attorney's Experience at the Time He Represented j2*

· The Attorney worked at Kenyon & Kenyon ("Kenyon") from 2002 to 2005, and began representing j2 as part of a team of attorneys in 2004. (Bernstein Decl. ¶¶ 4–5, Dkt. No. 77–2.) Crowell maintains that assigning the Attorney to Open Text was appropriate in part because he was only "a junior associate" when he represented j2. (Sacks Decl. Ex. F at 16, Dkt. No. 77–3.) Although the Attorney was an associate in 2004, by the end of that year he had many years of experience as a software engineer, studied graduate-level Computer Science, graduated *cum laude* from a reputable law school (where he served as Managing Editor of the *Law Review*), edited a publica-tion about the International Trade Commission, co-authored another about patent litigation, and delivered a speech about international patent licensing. (Johnson Decl. Ex. 14, Dkt. No. 113.)

### B. · *The Work the Attorney Performed for j2*

Crowell also asserts that the Attorney cleared its conflicts check because he allegedly told Crowell that "he did not recall having access to any confidential information," and his representation of j2 "involved primarily the review of publicly available patent documents." (Sacks Decl. Ex. B at 6, Dkt. No. 77.)

The records before that court indicate that from 2004 until 2005 the Attorney represented j2 in patent litigation, and he billed j2 for 234.7 hours of work. (*Id.* ¶¶ 5–6; *In Camera* Evidence.) Based on the court's knowledge of law firm practices, 234.7 hours probably represents about ten percent of his billing over the roughly fifteen months that he worked on j2 matters. Specifically, the Attorney billed j2 69.8 hours for his work on *j2 Global Communications, Inc. v. Venali, Inc.* (*"Venali"*), 84.6 hours for *j2 Global Communications, Inc. v. Call Wave, Inc.* (*"Call Wave"*) (collectively "the Prior Cases"), and 56 hours for "Bobo" patent analysis. (Bernstein Decl. ¶¶ 2, 6–7.)

In the *Venali* and *Callwave* actions, j2 alleged infringement of U.S. Patent Nos. 6,208,638 ("'638 Patent") and 6,350,066 ("'066 Patent"), and it also alleged infringement of U.S. Patent No. 6,597,688 ("'688 Patent") in the *Venali* case. (Bernstein Decl. ¶ 2.) A number of patents comprise the Bobo patents, and the '066 Patent is one of them. (Bernstein Decl. ¶ 7.) j2 alleges that the '638 and '688 Patents were infringed in each of the Three Cur-

rent Cases, and that the '066 Patent was also infringed in two of those cases.[2]

■ The Attorney's billing records from Kenyon indicate he was involved in the following tasks on behalf of j2: "reviewing claim charts, performing infringement analyses, searching for and analyzing prior art, drafting a validity opinion, analyzing documents for a settlement conference, reviewing and commenting on draft pleading, discussing discovery strategies, drafting discovery requests and responses, and drafting j2's opposition to a summary judgment motion in the *Venali* action." (Bernstein Decl. ¶ 6; *In Camera* Evidence.) The Attorney sent, received (sometimes directly, sometimes by forwarding), or was copied on over 120 emails to or from j2's General Counsel. (Bernstein Decl. ¶ 9; *In Camera* Evidence.) These emails were sent to about seven or eight individuals, and sometimes involved evaluations of j2's cases. (*In Camera* Evidence.) One email the Attorney received analyzed possible infringement defenses. (Bernstein Decl. ¶ 12; *In Camera* Evidence.) That email discussed Dr. David Farber ("Dr. Farber"), and whether his activities are relevant to an on-sale bar defense.[3] (*In Camera* Evidence.) (Bernstein Decl. ¶ 12; *In Camera* Evidence.) In the Three Current Cases, Defendants claim products that Dr. Farber was allegedly involved in testing and analyzing give rise to an on-sale defense to j2's '688 and '638 patent infringement claims. (Defendant's Answer to Amended Compl. ("An-

swer") at 10:24–15:5, Dkt. No. 48.) In 2005, the year that the Attorney left Kenyon, the United States Patent Office began a multi-year reexamination of the '066, '638, and '688 Patents, which led to changes in at least the '066 and '638 Patents. (Carmody Decl. ¶¶ 16–18, Dkt. No. 101; *See id.* Exs. E–K.)

### C. *History of the Three Current Cases*

j2 filed two of the Three Current Cases on June 26, 2008, and the other on May 17, 2011.[4] EasyLink is a defendant in two of the actions ("the EasyLink Cases") (case numbers 9–4189 and 11–4239), and Open Text and Captaris are defendants in the other (9–4150). Open Text owns both of these other companies, acquiring Captaris in 2008 and EasyLink in 2012. (Davies Decl. ¶ 2.) Open Text retained an attorney ("Lead Trial Counsel") to represent it and Captaris in 2008, before Lead Trial Counsel was at Perkins. (*See* Carroll Decl. ¶ 5, Dkt. No. 100.) Lead Trial Counsel moved to Perkins in February 2012, and Open Text made Perkins its counsel of record when he did. (Carroll Decl. ¶¶ 14–15.) Lead Trial Counsel and another Perkins attorney began advising Open Text about the EasyLink acquisition in mid-February 2012. (*Id.* at ¶ 20.) It is unclear when Perkins began working on the EasyLink Cases, but it was before Dr. Farber's deposition, which took place on July 27, 2012. (*Id.* ¶¶ 28–29.)

---

2. Those two are case numbers 11–4239 and 9–4150.

3. The on-sale bar affirmative defense invalidates a patent if "(1) the invention at issue had become the 'subject of a commercial offer for sale' more than one year before the filing of the patent application; and (2) the invention was ready for patenting, either by, for example, having that invention reduced to practice or by preparing 'drawings or other

descriptions of the invention' that would enable one skilled in the art to practice the invention." *Special Devices, Inc. v. OEA, Inc.,* 270 F.3d 1353, 1354–55 (Fed.Cir.2001) (quoting *Pfaff v. Wells Elecs., Inc.,* 525 U.S. 55, 67–68, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998)).

4. Compl., Dkt. No. 3 (case no. 9–4150); Compl., Dkt. No. 3 (case no. 9–4189); Compl., Dkt. No. 1 (case no. 11–4239).

## D. *The Conflicts Check and the Attorney's Open Text Assignment*

The Attorney is now Counsel at Crowell. (Johnson Decl. Ex. 14.) In 2011, Open Text began searching for an in-house attorney to work on "intellectual property and patent matters," but was "unable to fill the role even as Open Text's intellectual property and patent needs grew." (Davies Decl. ¶ 6.) It asked Crowell to provide an attorney who could temporarily assume this position until a permanent candidate was selected. (*Id.*) As discussed, Crowell assigned the Attorney to fill this role, even though it knew that he previously represented j2 (*Id.* ¶ 9; Sacks Decl. Ex. B at 6.)

j2 was never asked to sign a conflict waiver, allowing the Attorney to work for Open Text. (Bernstein Decl. ¶ 13.) Perkins likewise knew nothing about the Attorney's prior involvement with j2. (*See* Parker Decl. ¶ 4, Dkt. No. 103; Carroll Decl. ¶ 24.)

The Attorney told Open Text's General Counsel that while he was at Kenyon he "performed a public art search relating to a Bobo patent," and the General Counsel states that he "did not understand this to mean that [the Attorney] had worked for j2." (Parker Decl. ¶ 4.)

## E. *The Attorney's Role in the Three Current Cases*

In his role with Open Text, the Attorney met with Perkins on a number of occasions. (*Id.* ¶ 6.) Crowell has described the Attorney's work for Open Text as follows:

> He was given an initial assignment for Open Text during the fourth quarter of 2011 to familiarize himself with the company's products and pending IP litigations. That process included his introductions to Perkins Coie lawyers representing Open Text .... Later, he was asked to assist Open Text in collecting documents for Perkins Coie's use in responding to discovery requests. As [the Attorney] became more familiar with the j2 litigation, he followed Perkins Coie's litigation work and provided his views and comments thereon to Open Text in-house counsel, together with reports on the progress of the litigation. After j2 proposed that the parties mediate their dispute, [the Attorney] assisted Open Text with preparation for the mediation that was to have occurred in May 2012.

(Sacks Decl. Ex. F. at 16, Dkt. No. 77.) j2 learned of the Attorney's role at Open Text on July 27, 2012, during the deposition of Dr. Farber, when he introduced himself as Open Text's "outside in-house counsel" to one of j2's attorneys at Kenyon (Bernstein Decl. ¶ 13.) At the Farber deposition, j2's attorney announced that the Attorney used to be an associate at Kenyon, and that he would check whether the Attorney worked on j2 patent matters. (Carroll Decl. ¶ 30.) The next week, j2's attorney informed Perkins and Open Text that the Attorney had worked for j2. (*Id.*)

Two events followed the Farber deposition, but it is unclear which occurred first. The Attorney met with EasyLink's counsel of record at the time, King & Spaulding, "where we [King & Spalding] presented to [the Attorney] our evaluation of the litigation." (Sacks Decl. Ex. J at 32.)[5] Additionally, Perkins and Open Text ended communication with the Attorney. (Davies Decl. ¶ 15; Carroll Decl. ¶¶ 31–32.)

## III. *Legal Standards and Analysis*

There are five issues: (1) Whether California law governs; (2) Whether the court should presume the Attorney learned con-

---

5. As discussed, Perkins began working on the EasyLink Cases sometime before the Farber deposition, but Perkins did not appear as counsel of record on behalf of EasyLink until October 11, 2012. (*See* Carroll Decl. ¶ 21.)

fidential information about j2 that is relevant to the Three Current Cases; (3) Whether the court should presume that the Attorney shared j2's confidential information with Perkins; (4) Whether such a presumption is irrebutable; and (5) Whether disqualifying Perkins is required.

Regarding the first issue, California law governs. *In re County of Los Angeles,* 223 F.3d 990, 995 (9th Cir.2000). As to the second through fifth, the California Supreme Court has stated the following:

> That enduring duty to preserve client confidences precludes an attorney from later agreeing to represent an adversary of the attorney's former client unless the former client provides an informed written consent waiving the conflict. If the attorney fails to obtain such consent and undertakes to represent the adversary, the former client may disqualify the attorney by showing a substantial relationship between the subjects of the prior and the current representations. To determine whether there is a substantial relationship between successive representations, a court must first determine whether the attorney had a direct professional relationship with the former client in which the attorney personally provided legal advice and services on a legal issue that is closely related to the legal issue in the present representation. If the former representation involved such a direct relationship with the client, the former client need not prove that the attorney possesses actual confidential information. Instead, the attorney is presumed to possess confidential information if the subject of the prior representation put the attorney in a position in which confidences material to the current representation would normally have been imparted to counsel.... When a substantial relationship between the two representations is established, the attorney is automatically disqualified from representing the sec-

ond client.... Vicarious disqualification rules are a product of decisional law. Normally, an attorney's conflict is imputed to the law firm as a whole on the rationale that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information.

*City & County of San Francisco v. Cobra Solutions, Inc.,* 38 Cal.4th 839, 847–48, 43 Cal.Rptr.3d 771, 135 P.3d 20 (2006) (internal citations and quotation marks omitted). The facts in this Motion are not typical of disqualification motions generally because the Attorney worked as Open Text's outside in-house counsel, not as a Perkins attorney. However, the court holds the above-quoted rule applies here. The Attorney's prior representation involved three of the four patents at issue in the Three Current Cases, as well as an on-sale bar defense related to Dr. Farber's activities. The prior representation is, thus, substantially similar to the Three Current Cases. Because the Attorney was outside in-house counsel for Open Text on IP matters, and because of his contact with Perkins, Perkins must be disqualified.

### A. *California Law Governs*

■ Defendants argue that while federal courts in California look to California law in deciding a disqualification motion, state law does not bind them in the way that a diversity case would, because federal courts are governed by their own rules of professional conduct. (Defendant's Opposition to Plaintiffs' Motion to Disqualify ("Opp'n") at 12:26–13:7, Dkt. No. 97.) The Ninth Circuit, however, has made clear that a federal court in California must apply California law in a disqualification motion. *In re County of Los Angeles,* 223 F.3d at 995 ("[W]e apply state law in determining matters of disqualification.").

Defendants' argument relies principally on a footnote from an unpublished North-

ern District of California case. *Openwave Sys., Inc. v. 724 Solutions (US) Inc.*, No. C 09–3511 RS, 2010 WL 1687825, at *5 n. 6 (N.D.Cal. Apr. 22, 2010). However, even that case applied California law, because its local rule required attorneys to adhere to "California State Bar standards." *Id.* The Central District similarly requires attorneys to "comply with the standards of professional conduct required of members of the State Bar of California and contained in the State Bar Act, the Rules of Professional Conduct of the State Bar of California, and the decisions of any court applicable thereto." Cent. Dist. L.R. 83–3.1.2. The Central District rule "adopt[s]" such California "statutes, rules and decisions." *Id.* California law, therefore, governs.

## B. *The Court Presumes the Attorney Possesses Confidential Information about j2*

■ It is presumed that an attorney has relevant confidential information about a client if there is a substantial relationship between the prior representation and the current one. *Cobra Solutions*, 38 Cal.4th at 847, 43 Cal.Rptr.3d 771, 135 P.3d 20. In determining whether there is substantial relationship, the court should first analyze whether there was a direct relationship between an attorney and the former client, and whether that relationship touched issues related to the present litigation. *Id.* Courts emphasize shared communications in determining whether there was a direct relationship. *See e.g. Farhang v. Indian Inst. of Tech.*, No. C–08–02658RMW, 2009 WL 3459455, at *2 (N.D.Cal. Oct. 27, 2009). During the Attorney's time representing j2, he and j2's General Counsel were part of a group of about seven or eight attorneys that regularly sent emails to each other. (Bernstein Decl. ¶ 9; *In Camera* Evidence.) In total the Attorney and j2's General Counsel were parties to over 120 emails. (*Id.*) One email con-

cerned Dr. Farber, and his relevance to an on-sale bar defense, which is also at issue in the Three Current cases. (*In Camera* Evidence.) Many of these emails focused on the Prior Cases, where three of the four patents currently at issue were litigated. (*Id.*) Some of the emails relating to the Prior Cases shared drafts of papers that would later be filed with the court, and others assessed the strength of j2's cases. (*Id.*) In light of these exchanges, the court finds that a direct relationship between the Attorney and the client existed.

■ When an attorney had direct contact with a client, a substantial relationship exists if "the subject of the prior representation put the attorney in a position in which confidences material to the current representation would normally have been imparted to counsel." *Cobra Solutions*, 38 Cal.4th at 847, 43 Cal.Rptr.3d 771, 135 P.3d 20. The substantial relationship test is "necessarily fact-dependant." *UMG Recordings, Inc. v. MySpace, Inc.*, 526 F.Supp.2d 1046, 1060 (C.D.Cal.2007). Courts look to the degree of overlap in "subject-matters, facts or issues" to determine whether there is a substantial relationship. *See id.* (quoting *H.F. Ahmanson & Co. v. Salomon Brothers, Inc.*, 229 Cal. App.3d 1445, 1453, 280 Cal.Rptr. 614 (1991)). Subject matter similarity is the most important. *Jessen v. Hartford Cas. Ins. Co.*, 111 Cal.App.4th 698, 711, 3 Cal. Rptr.3d 877 (2003) (suggesting that the California Supreme Court has decided that "a 'substantial relationship' exists whenever the 'subjects' of the prior and the current representations are linked in some rational manner") (citing *Flatt v. Superior Court*, 9 Cal.4th 275, 283, 36 Cal.Rptr.2d 537, 885 P.2d 950 (1994)). A "subject" is "broader ... than the discrete legal and factual issues involved in the compared representations," as it includes "information material to the evaluation, prosecu-

tion, settlement or accomplishment of the litigation or transaction given its specific legal and factual issues." *Jessen,* 111 Cal. App.4th at 712–13, 3 Cal.Rptr.3d 877.

■ Defendants argue that there is no substantial relationship because the Three Current Cases "involve different defendants, claims and evidence," and they emphasize that "[i]n the intervening years between [the Attorney's j2 representation and his representation of Open Text], the patents have been reexamined by the PTO and their claims have been substantially altered." (Opp'n at 22:7–10.) It is true that the patents have been altered, but to different degrees. (*See* Opp'n 10:13–21 (claiming the reexamination process required "extensive changes to the '066 patent" and "significant changes to the '638 patent," but not noting any level of change in the '688 patent); *see also* Carmody Decl. ¶¶ 16–18 (describing the changes similarly).)

More importantly, nothing requires the court to extensively analyze the patents' modifications, nor to do an in-depth comparison of the products. To the contrary, a rational link between the subject matter of the two cases will suffice. *Jessen,* 111 Cal.App.4th at 711, 3 Cal.Rptr.3d 877 (2003); *Knight v. Ferguson,* 149 Cal. App.4th 1207, 1213, 57 Cal.Rptr.3d 823 (2007).[6] In addition to other matters the Attorney billed to j2, he billed j2 154.4 hours for work on the Prior Cases, which involved three of the four patents at issue in the Three Current Cases. (*See* Bernstein Decl. ¶¶ 2, 6.)

Additionally, the on-sale bar defense was at issue in the cases the Attorney worked on as j2's attorney, and as j2's attorney he received an email evaluating Dr. Farber's relevance to this defense. (*In Camera* Evidence.) Dr. Farber's activities are relevant to a possible on-sale bar defense in the Three Current Cases, as well. (*See* Answer at 10:24–15:5.) In fact, j2 learned of the Attorney's work with Open Text in the Three Current Cases, when he attended Dr. Farber's deposition. (Bernstein Decl. ¶ 13.) In disputing Dr. Farber's importance to the disqualification analysis, Defendants argue that they knew about him, along with his import to an on-sale bar defense, before the Attorney became involved with Open Text. (Opp'n at 8:6–11; Carmody Decl. ¶¶ 9–12; Bellows Decl. ¶ 2, Dkt. No. 104.) However, the Attorney still could have provided additional useful to Perkins concerning Dr. Farber. Because the Prior Cases are substantially related to the Three Current Cases the court presumes that the Attorney possessed confidential information. *See Cobra Solutions,* 38 Cal.4th at 847–48, 43 Cal.Rptr.3d 771, 135 P.3d 20.

■ At times, Defendants refer to the Attorney as a "junior associate," and assert that there is a "lack of evidence" about both the "nature of the work" he did for j2 and whether he acquired confidential information about j2. (Defendants' Supplemental Brief in Support of Defendant's Opposition to j2's Motion to Disqualify Perkins Coie and Compel Discovery ("Supp. Opp'n.") at 10:22–11:5, Dkt. No.

---

**6.** Anything more than a "rational link" test would effectively require a mini-trial on the merits, entailing a comparison of the patents as they existed initially with any subsequent modifications. Expert testimony would then likely have to be presented and evaluated. Such a time-consuming process would add little value. The court would still not know whether the former attorney may have, even unwittingly, communicated important information about, for example, the financial strength of the former client, the former client's settlement strategy, the former client's perceived strengths or weaknesses of its claims or defenses, and other information that might give counsel an unfair advantage in the litigation.

122.) However, a de minimis level of involvement with a prior case is sufficient for presuming that an attorney acquired confidential information about that prior case. *See Pound v. DeMera DeMera Cameron,* 135 Cal.App.4th 70, 73–74, 36 Cal.Rptr.3d 922 (2005) (finding that a one-hour phone call about a case three years earlier was sufficient to presume that an attorney acquired confidential information).

Regardless, both the Attorney's professional experience and the extent of his work for j2 were significant. At the time he was representing j2, he had authored and edited publications about intellectual property, done graduate work in computer science, and worked for many years as a software engineer. (Johnson Decl. Ex. 14). Additionally, *in camera* evidence shows that his work in the Prior Cases included: "reviewing claim charts, performing infringement analyses, [reviewing] prior art ... analyzing documents for a settlement conference, reviewing and commenting on draft pleading, discussing discovery strategies, drafting discovery requests and responses, and drafting j2's opposition to a summary judgment motion ..." (Bernstein Decl. ¶ 6; *In Camera* Evidence.) In some of this work, such as discussing discovery strategies and participating in the creation and editing of motions and pleadings, the likelihood that he learned confidential information is readily apparent. In others, such as reviewing prior art, the risk may seem less likely. However, confidential information may guide prior art reviews—such as an instruction from a partner or client about the weaknesses of certain features.

## C. *The Court Presumes that Perkins has the Same Confidential Information about j2 as the Attorney*

■ The general rule is that presuming an attorney possesses confidential information requires presuming the same for his law firm ("the Vicarious Presumption Rule"). *See People ex rel. Dept. of Corporations v. SpeeDee Oil Change Sys., Inc.,* 20 Cal.4th 1135, 1146, 86 Cal.Rptr.2d 816, 980 P.2d 371 (1999) (ruling that "a presumption that an attorney has access to privileged and confidential matters relevant to a subsequent representation extends the attorney's disqualification vicariously to the attorney's entire firm"); *see id.* at 1153–54, 86 Cal.Rptr.2d 816, 980 P.2d 371 (explaining that, "[t]he vicarious disqualification rule recognizes the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information"). The Attorney, however, does not work at Perkins. Rather, he was outside in-house counsel for Open Text on intellectual property matters. (Davies Decl. ¶¶ 6, 9; Bernstein Decl. ¶ 13.) This court is not aware of any case analyzing whether the Vicarious Presumption Rule applies to such a situation. However, some cases have analyzed whether presuming an attorney at one law firm has confidential information requires making the same presumption about another firm that is co-counsel with the tainted attorney. These cases come out different ways, but the cases applying the Vicarious Presumption Rule to co-counsel have the better argument.

Three Northern District of California cases suggest that presuming co-counsel possesses confidential information is inappropriate. *In re Airport Car Rental Antitrust Litig.,* 470 F.Supp. 495, 506 (N.D.Cal. 1979); *see also Canatella v. Krieg, Keller, Sloan, Reilley & Roman LLP,* No. C 11–05535 WHA, 2012 WL 847493, at *2 (N.D.Cal. Mar. 13, 2012) (making no mention of a presumption, and relying on *Airport Car Rental* to suggest that a multi-factor analysis is required to determine whether co-counsel has confidential information); *Oracle Am., Inc. v. Innovative Tech. Distributors, LLC,* No. 11–CV–

01043–LHK, 2011 WL 2940313, at *6 (N.D.Cal. July 20, 2011). Other cases have applied the Vicarious Presumption Rule and presumed that co-counsel received confidential information. *Pound*, 135 Cal. App.4th at 77, 36 Cal.Rptr.3d 922 (noting the Vicarious Presumption Rule, and holding that "there is no logical or substantive manner to distinguish" between a firm employing a tainted attorney and a firm serving as co-counsel with a tainted attorney); *Beltran v. Avon Products, Inc.*, 867 F.Supp.2d 1068, 1078, 1084 (C.D.Cal.2012) (stating the Vicarious Presumption Rule, and applying it against co-counsel, because "[i]t is also reasonable to assume that the two law firms engaged in fairly extensive discussions about the case and Plaintiff's litigation strategy before filing their complaint and prior to the erection of an wall ethical segregating [the tainted attorney] from the case").

■ This court concludes that the Vicarious Presumption Rule should be applied here (i.e., that it should be presumed that Perkins has relevant confidential information about j2.) The three Northern District cases that did not apply the Vicarious Presumption Rule to co-counsel are not persuasive. They do not consider applicable California law. *Oracle* and *Canatella* rely heavily on *Airport Car*, which was decided in 1979. *Canatella*, 2012 WL 847493, at *2, *Oracle*, 2011 WL 2940313, at *5. It seems neither *Oracle* nor *Canatella* considered *Pound*, a California appellate case that presumed co-counsel possessed the tainted attorney's confidential information. *Pound*, 135 Cal.App.4th 70, 77, 36 Cal.Rptr.3d 922 (2005). And *Pound* does not appear to have been briefed in either case. (Johnson Decl. Exs. 6–11.) *Canatella* even incorrectly declares that on "the issue of disqualification of co-counsel ... no California ... cases [are] directly on point." *Canatella*, 2012 WL 847493, at *2. Additionally, California courts have generally ignored these three cases. *Airport*

*Car* is the only one cited in any California opinion, and a single case from 1980 is the only one that cites its holding approvingly. *Chadwick v. Superior Court*, 106 Cal. App.3d 108, 117 n. 9, 164 Cal.Rptr. 864 (1980).

More importantly, the reasoning behind the Vicarious Presumption Rule indicates that it should also be applied against Perkins: "Normally, an attorney's conflict is imputed to the law firm as a whole on the rationale that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information." *Cobra Solutions*, 38 Cal.4th at 847–48, 43 Cal.Rptr.3d 771, 135 P.3d 20. (internal quotation marks omitted.) The Attorney served as Open Text's outside in-house counsel for intellectual property matters, and the Three Current Cases are high-stakes, complex patent matters. The importance of in-house counsel effectively cooperating, coordinating, and communicating with their company's attorneys is self-evident.

Defendants' argument that the Attorney "played a limited role" in the Three Current Cases is unavailing. (Carroll Decl. ¶ 25.) It is probably a stretch to characterize Open Text's outside in-house counsel for intellectual property matters—an experienced attorney who was also Counsel at Crowell—as playing an inconsequential role in three major patent cases. Leaving that concern aside, though, cases do not analyze how much work a tainted attorney performed in the cases for which disqualification is sought. *See Pound*, 135 Cal. App.4th at 74, 36 Cal.Rptr.3d 922 (disqualifying plaintiff's firm after it and the tainted outside counsel "briefly discussed the case" and met with plaintiffs "a few times.") Under the Vicarious Presumption Rule, once an attorney is presumed to have confidential information, her law firm is presumed to have it, too. *Cobra Solu-*

*tions,* 38 Cal.4th at 847–48, 43 Cal.Rptr.3d 771, 135 P.3d 20; *See Flatt,* 9 Cal.4th at 283, 36 Cal.Rptr.2d 537, 885 P.2d 950.

### D. The Presumption Against Perkins Is Irrebutable and Thus Disqualification Is Mandatory

■ Once there is a presumption that a firm possesses confidential information, generally that presumption is irrebutable and disqualification is compelled. As the California Supreme Court has said:

> Where the requisite substantial relationship between the subjects of the prior and the current representations can be demonstrated, access to confidential information by the attorney in the course of the first representation (relevant, by definition, to the second representation) is *presumed* and disqualification of the Attorney's representation of the second client is mandatory; indeed, the disqualification extends vicariously to the entire firm.

*Flatt,* 9 Cal.4th at 283, 36 Cal.Rptr.2d 537, 885 P.2d 950 (emphasis in original); *see generally Pound,* 135 Cal.App.4th 70, 36 Cal.Rptr.3d 922 (applying mandatory disqualification rule to law firm with tainted co-counsel); *In re County of Los Angeles,* 223 F.3d at 995 (noting that "[t]he [California] courts of appeal developed a general rule that the presumption is not rebuttable").

However, in one case the California Supreme Court held that it "need not consider whether an attorney can rebut a presumption of shared confidences, and avoid disqualification, by establishing that the firm imposed effective screening proce-

dures." *SpeeDee Oil,* 20 Cal.4th at 1151, 86 Cal.Rptr.2d 816, 980 P.2d 371; *see also In re County of Los Angeles,* 223 F.3d at 997 (interpreting *SpeeDee Oil* as suggesting that the California Supreme Court "may be inclined" to allow law firms to erect ethical walls to avoid disqualification); *but see Beltran,* 867 F.Supp.2d 1068, 1083 (C.D.Cal.2012) (doubting that ethical screening can prevent disqualification); *MySpace,* 526 F.Supp.2d at 1061 (questioning the same). At least one California appellate court has decided that a law firm's ethical screening permitted it to attempt rebutting the presumption. *Kirk v. First Am. Title Ins. Co.,* 183 Cal.App.4th 776, 801, 108 Cal.Rptr.3d 620 (2010) (holding that disqualification is the *"general* rule," and that courts "should presume knowledge is imputed to all members of a tainted attorney's law firm," but that "in the proper circumstances, the presumption is a rebuttable one, which can be refuted by evidence that ethical screening will effectively prevent the sharing of confidences in a particular case") (emphasis in original).[7] Such screening must be implemented in a "timely" manner. *Id.* at 810, 108 Cal.Rptr.3d 620.

■ In the Three Current Cases, the Attorney was not screened until after Dr. Farber's deposition, approximately eight months after he began serving as Open Text's outside in-house counsel. (*See* Parker Decl. ¶¶ 4–5.) Since Perkins was unaware of the Attorney's conflict, it did not initiate a timely screen. *See Kirk,* 183 Cal.App.4th at 810 n. 31, 108 Cal.Rptr.3d 620 (suggesting that the ethical wall must

---

7. Defendants argue that *Kirk* forbids automatically disqualifying a law firm merely because of its association with a tainted attorney, and requires proof that the Attorney shared confidences with the firm before disqualification is appropriate. (*See* Opp'n at 14:2–12.) Defendants offer declarations from Perkins attorneys and others as proof that

they never acquired confidential information from the Attorney. (*See* Dkt. Nos. 98–105.) However, *Kirk* only allowed timely ethical screening to rebut the presumption, and further held that "it is not sufficient to simply produce declarations stating that confidential information was not conveyed." 183 Cal. App.4th at 801, 810, 108 Cal.Rptr.3d 620.

be in place "before undertaking the challenged representation or hiring the tainted individual" (internal quotation marks omitted)); *In re County of Los Angeles,* 223 F.3d at 996 (emphasizing screening measures taken before tainted individual joined the firm). For Perkins, therefore, the presumption is irrebuttable.

### E. *No Remedy Short of Disqualification Will Suffice*

■ Defendants argue that the court should fashion a remedy less drastic than disqualification. (Supp. Opp'n at 8:17–10:10, Dkt. No. 122.) The leading case on point for this issue held:

> [E]ven when the court has misgivings about the conduct of the challenged attorney, it is not obligated to disqualify that lawyer merely because he has run afoul of the applicable ethical rules. The court is encouraged instead to examine the specific facts and circumstances peculiar to the individual case to decide whether disqualification, or some lesser sanction, would be an appropriate remedy. In other words, even when counsel has been shown to have committed an ethical rule infraction the court retains discretion to decline to order disqualification, and, in many cases, courts have done just that.

*MySpace, Inc.,* 526 F.Supp.2d at 1063 (citation omitted). *MySpace,* however, involved very different facts. That case concerned a law firm that obtained a conflict waiver from its former client, enacted an ethical wall around the attorneys who worked for the prior client before engaging in work for the current client, and whose current client waived the affirmative defense that triggered the conflict—an affirmative defense that was "collateral to what this case is about." *Id.* at 1063–65. None of these factors are present here.

### IV. *Conclusion*

Perkins is disqualified. The court denies the request for further discovery, because the order disqualifies Perkins, screens Open Text's General Counsel, Douglas Parker, and screens all inhouse attorneys who substantively discussed the Three Current Cases with the Attorney. (*See* Parker Decl. ¶ 6 (attesting to having been "a participant in many of the instances in which [the Attorney] had an opportunity to communicate with and interact with attorneys from Perkins Coie")).

■ The court finds that none of Perkins' attorneys had knowledge of the Attorney's prior j2 representation. Indeed, during oral argument the court characterized Perkins as a victim of Crowell's inexplicable decision to approve the Attorney to work for Open Text. The court affirms Perkins' innocence in this matter, and appreciate the professionalism its attorneys have exhibited. Perkins' innocence though, does not prevent its disqualification. Motions to disqualify are not about punishing guilty parties. *Kirk,* 183 Cal. App.4th at 815, 108 Cal.Rptr.3d 620. They are primarily about "preserv[ing] public trust in the scrupulous administration of justice and the integrity of the bar." *SpeeDee Oil,* 20 Cal.4th at 1145, 86 Cal. Rptr.2d 816, 980 P.2d 371.

### V. *Remedies*

The Motion is GRANTED as to disqualifying Perkins, but is DENIED as to compelling discovery. Accordingly, IT IS HEREBY ORDERED:

1) Perkins is disqualified from representing Defendants in this litigation. Defendants shall have until January 11, 2013, to retain successor counsel and have such counsel appear in the action.

2) In connection with the transition to new counsel, Perkins shall have no further

involvement in this action, except Perkins may transmit to successor counsel its written files concerning this action, including all documents produced by either party in this action and all pleadings either filed with the court or exchanged with j2 in this action. However, notes and other nonpublic documents (collectively "non-public documents") prepared after November 1, 2011, that contain or otherwise reflect thoughts of disqualified or screened firms or individuals may not be transmitted, unless they are accompanied with a declaration, signed under penalty of perjury, from a partner ("the Partner") at Perkins with substantial familiarity with this case, attesting as follows: That the Partner has exercised due diligence in evaluating the propriety of transmitting the non-public documents to successor counsel, and attests to the best of such Partner's information and belief that the Attorney did not provide, directly or indirectly, any information contained within the non-public documents.

3) Defendants shall immediately screen from further participation in this action Douglas Parker. Any other internal counsel or external counsel need not be screened, provided they submit a declaration signed under penalty of perjury, attesting that they have not had substantive communications with the Attorney or with any one else whom they reasonably believe may have received information from the Attorney concerning this action. By January 11, 2013, Defendants shall provide j2 and the court with both a list identifying all persons in addition to Mr. Parker who have been screened and the required affidavits.

4) Successor counsel shall not communicate with Crowell, Perkins, Douglas Parker, the Attorney, any screened person, or any other person, who had communications with the Attorney about any matter related to this action.

5) Defendants shall reimburse j2's reasonable attorneys' fees and costs incurred in connection with the Motion. By January 11, 2013, j2 shall submit to Defendants a statement identifying the amount of such fees, together with a breakdown, by attorney, of the amount of time spent on such matters. The parties shall make every effort to resolve any fee dispute without court action.

Nothing contained herein is intended to prevent any party, person, or firm from communicating about ministerial or logistical issues required to transition to new counsel. Nothing contained herein is intended to preclude the parties or attorneys from stipulating to additional exceptions to this order in connection with any collateral dispute.

IT IS SO ORDERED.